IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Mark A. Burnett, Chief Judge, Honorable Claire
R. Kelly, Judge, and Honorable Timothy C. Stanceu, Judge

| | |
|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Acting Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of the Department of Homeland Security*, <br><br> Defendants. | Case No. 26-cv-01606 |

**Plaintiffs' Motion for Preliminary Injunction and/or
Summary Judgment for Permanent Injunction**

In accordance with Rule 7 and 65 of the Rules of the United States Court of

International Trade, Plaintiffs move for a preliminary injunction, preventing

Defendants from enforcing the tariffs imposed by Proclamation No. 11012 (Feb. 20,

2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation"). In addition,

or in the alternative, Plaintiffs move for summary judgment and request the entry

of a permanent injunction, pursuant to Rule 56 of the United States Court of

International Trade, to permanently enjoin Defendants from enforcing the tariffs

imposed by the Section 122 Proclamation.

Plaintiffs request that this Court issue the following relief:

(A) hold that Plaintiffs:

(1) have a likelihood of success on the merits of their claims; and/or

(2) are entitled to judgment as a matter of law on their claim that Section

122 of the Trade Act of 1974 does not give the President the power to

impose special import measures to restrict imports, including tariffs,

unless the specific statutory requirements are met. Specifically, Section

122 does not give the President the power to impose tariffs under current

economic conditions and does not allow those tariffs to discriminate

among countries and products;

(B) issue a preliminary injunction preventing the imposition of all tariffs set

forth in the Section 122 Proclamation; and/or

(C) issue summary judgment in favor of Plaintiffs and permanently enjoin

the imposition of all tariffs set forth in the Section 122 Proclamation;

(D) award a refund of duties paid by Plaintiffs imposed by the Section 122

Proclamation;

(E) award Plaintiffs their attorneys' fees and costs under the Equal Access to

Justice Act, 28 U.S.C. § 2412(d), and any other applicable law; and

(F) grant other just relief as this Court may deem just or proper.

Plaintiffs seek a preliminary injunction for the duration of this litigation, including all relevant appeals and remands, until such time as a final court decision is rendered. Plaintiffs seek to preliminarily enjoin Defendants' actions imposing and enforcing tariffs, which pose a threat to Plaintiffs' business operations.

In support, Plaintiffs rely upon their Complaint, the following Memorandum, and the accompanying declarations, attached as Exhibits A and B.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Jeffrey M. Schwab
Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org

*Counsel for Plaintiffs Burlap and Barrel, Inc, and Basic Fun, Inc.*

</div>

Dated: March 13, 2026

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Mark A. Burnett, Chief Judge, Honorable Claire
R. Kelly, Judge, and Honorable Timothy C. Stanceu, Judge

| | |
|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, INC., | |
| Plaintiffs, | |
| v. | Case No. 26-cv-01606 |
| DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Acting Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of the Department of Homeland Security*, | |
| Defendants. | |

**Proposed Order**

Upon consideration of Plaintiffs' Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction, and after due deliberation, it is hereby:

ORDERED that Plaintiffs' Motion for Preliminary Injunction/Motion for Summary Judgment is granted; and it is further

ORDERED that Defendants are enjoined pending resolution of this matter/permanently from enforcing the tariffs imposed by Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026).

_____

Judge, United States Court of International Trade

Dated: _____

# Table of Contents

Table of Authorities ................................................................................................ ii

Facts .................................................................................................................... 2

    I.    The President's Tariffs ................................................................. 2

        A.  The IEEPA Tariffs ............................................................... 2

        B.  The Section 122 Tariffs ........................................................ 4

    II.   Section 122 ................................................................................ 6

    III.  Plaintiffs' Injuries ..................................................................... 10

        A.  Injury to Burlap and Barrel, Inc. ......................................... 10

        B.  Injury to Basic Fun, Inc. ...................................................... 13

Legal Standard ................................................................................................... 15

Summary of the Argument ................................................................................. 15

Argument ........................................................................................................... 16

    I.    The tariffs imposed by the President's Section 122 Proclamation exceed his lawful authority. ................................................................................ 16

        A.  Section 122 does not authorize the President to impose the challenged tariffs. ................................................................. 17

        B.  This Court should not grant presidents such sweeping authority without clear Congressional authorization. ........................... 24

        C.  If Section 122 did authorize the President to impose these tariffs, that would be an unconstitutional delegation of legislative power to the executive. ................................................................... 29

    II.   Plaintiffs will suffer irreparable harm if the President's Section 122 tariffs are not enjoined. ........................................................................ 35

    III.  The balance of interests weighs in favor of enjoining the President's Section 122 tariffs and an injunction serves the public interest. .............. 38

Conclusion .......................................................................................................... 40

Certificate of Compliance .................................................................................. 41

Certificate of Service .......................................................................................... 42

# Table of Authorities

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935).................................................................................. 29, 33

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021)........................................................................... 26, 27, 29

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) .................................................................... 39

*Am. Inst. for Int'l Steel, Inc. v. United States*,
376 F.Supp.3d 1335 (Ct. Int'l Trade 2019) ................................................ 31

*Biden v. Nebraska*,
600 U.S. 477 (2023)...................................................................................... 25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................... 15

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) .................................................................... 36

*Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United States*,
389 F.Supp.3d 1386 (Ct. Int'l Trade 2019) ................................................ 36

*Crowell v. Benson*,
285 U.S. 22 (1932)........................................................................................ 28

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015)................................................................... 30, 31, 33, 34

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)...................................................................................... 24

*Gundy v. United States*,
588 U.S. 128 (2019)...................................................................................... 33

*Harmoni Int'l Spice, Inc. v. United States*,
211 F. Supp. 3d 1298 (Ct. Int'l Trade 2017) .............................................. 36

*Hartranft* v. *Wiegmann*,
121 U.S. 609 (1887)...................................................................................... 21

*Hirabayashi v. United States*,
320 U.S. 81 (1943)........................................................................................ 35

*In re Section 301 Cases*,
524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) .............................................. 40

*Indus. Union Dep't, AFL-CIO v. API*,
448 U.S. 607 (1980)........................................................................ 26, 29, 32, 33

*J.W. Hampton, Jr. &Co. v. United States,*
   276 U.S. 394 (1928)............................................................................. 32

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018)............................................................................. 28

*Johnson v. Couturier,*
   572 F.3d 1067 (9th Cir. 2009)............................................................ 40

*Learning Res., Inc. v. Trump,* Nos. 24-1287, 25-250,
   2026 LEXIS 714 (Feb. 20, 2026)................................................ 4, 16, 17

*Marshall Field & Co. v. Clark,*
   143 U.S. 649 (1892)............................................................................. 32

*Mistretta v. United States,*
   488 U.S. 361 (1989)........................................................................ 30, 33

*Nat'l Treasury Emps. Union v. Trump,*
   No. 25-0935, 2025 U.S. Dist. LEXIS 80268 (D.D.C. Apr. 28, 2025) ........................ 40

*NFIB  v. OSHA,*
    595 U.S. 109 (2022) ........................................................................... 25

*Panama Refining Co. v. Ryan,*
   293 U.S. 388 (1935)...................................................................... 29, 33, 34

*Paul v. United States,*
   140 S. Ct. 342 (2019) ......................................................................... 33

*Retractable Techs., Inc. v. United States,*
   739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ....................................... 15, 36

*Sampson v. Murray,*
   415 U.S. 61 (1974)............................................................................... 35

*Silfab Solar, Inc. v. United States,*
   892 F.3d 1340 (Fed. Cir. 2018) ........................................................... 15

*Sumecht NA, Inc. v. United States,*
   331 F. Supp. 3d 1408 (Ct. Int'l Trade 2018)....................................... 35

*Suntec Indus. Co. v. United States,* No. 13-00157,
   2016 Ct. Intl. Trade LEXIS 40 (Ct. Int'l Trade Apr. 21, 2016)............... 15

*Tri Union Frozen Prods. v. United States,*
   161 F. Supp. 3d 1333 (Ct. Int'l Trade 2016) ......................................... 3

*United States* v. *Isham,*
   84 U.S. (17 Wall.) 496 (1873) ........................................................... 21

*United States v. U.S. Coin & Currency,*
   401 U.S. 715 (1971)............................................................................. 38

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ............................................................................ 8, 18

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014) ............................................................................................ 24

*V.O.S. Selections, Inc. v. United States*,
    722 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ...................................................... 4

*Wayman v. Southard*,
    23 U.S. (10 Wheat.) 1 (1825) .............................................................................. 32

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022) ............................................................................................ 25

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ............................................................................................ 30

*Yakus v. United States*,
    321 U.S. 414 (1944) ........................................................................................ 33, 34

*Zenith Radio Corp. v. United States*,
    710 F.2d 806 (Fed. Cir. 1983) ............................................................................ 35

**Statutes**

19 U.S.C. § 1862 ...................................................................................................... 27

19 U.S.C. § 2132 ...................................................................................... 9, 10, 17, 18

19 U.S.C. § 2251 ...................................................................................................... 27

19 U.S.C. § 2411 ...................................................................................................... 27

19 U.S.C. § 2481 ................................................................................................. 9, 18

50 U.S.C. § 1701 ........................................................................................................ 4

Mass. Const. pt. 1, art. XXX .................................................................................. 32

U.S. Const. art. I, § 1 .............................................................................................. 30

U.S. Const. art. I, § 8 ........................................................................................ 16, 26

U.S. Const. art. II, § 1 ............................................................................................ 31

**Other Authorities**

1 W. Blackstone, Commentaries on the Laws of England (1765) .............................. 31

119 Cong. Rec. H40,506 (Dec. 10, 1973) .................................................................. 21

Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 9:59 a.m.
    ET) .......................................................................................................................... 6

Erica York & Alex Durante, "Tariff Tracker: Impact of Trump Tariffs & Trade War
    by the Numbers," Tax Foundation, February 23, 2026 ................................ 25, 28

Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327 (2002) ........... 31

James McBride and Andrew Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?*, Council on Foreign Relations (2019) .......................................................... 23

Joint Economic Committee, 88th Congress, "The United States Balance of Payments-Perspectives and Policies," November 12, 1963 ..................................... 20

Joseph Bishop-Henchman, *High Protective Tariffs Have Been Short-Lived in American History*, Cato Institute, Apr. 8, 2025 ........................................................ 39

Lysle Boller, et. al, "Supreme Court Tariff Ruling: IEEPA Revenue and Potential Refunds," Penn Wharton Budget Model, Feb. 20, 2026 .......................................... 25

Mary Amiti, et. al, "Who Is Paying for the 2025 U.S. Tariffs?", Federal Reserve Bank of New York, February 12, 2026 ...................................................................... 25

Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* (1967) ............................................................................................ 22

*Recent Changes in Monetary Policy and Balance-of Payments Problems: Hearings Before the H. Comm. on Banking & Currency*, 88th Cong., 2d Sess. 235 (1964) ..... 7

Robert L. Hetzel, *Launch of the Bretton Woods System* (Fed. Reserve History, Nov. 22, 2013) ................................................................................................................. 6

Ruth Simon, *Small Sellers of Fireworks, Ski Apparel and Other Imports Can't Escape Tariff War*, WALL St. J., Apr. 11, 2025 ..................................................... 39

S. Rep. No. 93-1298, Trade Reform Act of 1974, H.R. 10710 (1974) ......................... 20

*The Bretton Woods Agreements* (Naomi Lamoreaux & Ian Shapiro eds., 2019) ..... 7, 8

The Federalist No. 47 (James Madison) ..................................................................... 32

*Trade Deficit and the Economy: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Finance*, 98th Cong. (1984) ............................................................... 21

U.S Customs and Border Protection, *CSMS # 67844987 – Imposing Temporary Section 122 Duties* (Feb. 23, 2026) ....................................................................... 6

*U.S. Bureau of Econ. Analysis, U.S. International Transactions Release—Additional Information* .............................................................................................................. 19

## Rules

Fed. R. Evid. 201(b) ................................................................................................... 3

USCIT R. 56(a) .......................................................................................................... 15

## Regulations

90 Fed. Reg. 15041 (April 7, 2025) ............................................................................ 3

90 Fed. Reg. 15621 (April 15, 2025) .......................................................................... 4

91 Fed. Reg. 9339 (Feb. 25, 2026) ............................................................................ 5

Executive Order No. 14193, 90 Fed. Reg. 9113 (Feb. 1, 2025)....................................2

Executive Order No. 14194, 90 Fed. Reg. 9117 (Feb. 1, 2025)....................................3

Executive Order No. 14195, 90 Fed. Reg. 9121 (Feb. 1, 2025)....................................3

Executive Order No. 14197, 90 Fed. Reg. 9183 (Feb. 3, 2025)....................................3

Executive Order No. 14200, 90 Fed. Reg. 9277 (Feb. 5, 2025)....................................3

Proclamation No. 4074, 85 Stat. 926 (1971) ....................................................7

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Mark A. Burnett, Chief Judge, Honorable Claire
R. Kelly, Judge, and Honorable Timothy C. Stanceu, Judge

| | |
|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Acting Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of the Department of Homeland Security*, <br><br> Defendants. | Case No. 26-cv-01606 |

**Memorandum in Support of Plaintiffs' Motion for Preliminary
Injunction and/or Summary Judgment for Permanent Injunction**

On February 20, 2026, in explicit response to the decision of the United States

Supreme Court (affirming this Court) invalidating his worldwide tariff regime

imposed under the International Emergencies Economic Powers Act (IEEPA), the

President announced a new, replacement tariff regime under Section 122 of the

Trade Act of 1974, recreating as closely as possible the rates (a global 10% tariff, possibly to be increased to 15%), as well as the various exemptions made for policy reasons under the IEEPA regime.

But Congress has not delegated any such power. Section 122 does not authorize the President to impose unilateral worldwide tariffs on any country he chooses at any rate he chooses—it only allows such under specific circumstances not extant here. The requirements set forth in Section 122 for the President to take action are not met: the United States's trade deficit in goods with other countries is not a balance of payments deficit.

Plaintiffs, a group of owner-operated businesses that each rely on imports from foreign countries, are irreparably harmed by the President's unlawful tariffs and therefore seek to enjoin the President from issuing tariffs under Section 122.

## Facts[1]

### I. The President's Tariffs

#### A. The IEEPA Tariffs

In February 2025, the President, after declaring a national emergency for the trafficking of opioids into the country, imposed 25 percent ad valorem duties on all products of Canada (Executive Order No. 14193, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025)) and Mexico (Executive Order No. 14194, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025)) and 10 percent ad valorem duties on all products of China (Executive Order

---

[1] The facts set forth in this section are not likely to be disputed and thus serve as a basis for Plaintiffs' motion for preliminary injunction, as well as their motion for summary judgment.

No. 14195, 90 Fed. Reg. 9121, 9222 (Feb. 1, 2025)) (the "Trafficking orders"). The purported reason for these tariffs was the purported failure of Mexico, Canada, and China to meaningfully address the trafficking of opioids from their countries into the United States. He issued subsequent orders modifying, suspending, or otherwise adjusting the Trafficking tariffs over the following months in 2025. *See, e.g.*, Executive Order No. 14200, 90 Fed. Reg. 9277 (Feb. 5, 2025) (ending duty-free de minimis treatment for articles imported from China); Executive Order No. 14197, 90 Fed. Reg. 9183 (Feb. 3, 2025) (suspending tariffs on Canada).

And on April 2, 2025, "Liberation Day," the President issued Executive Order 14257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits." (the "Liberation Day Order"). 90 Fed. Reg. 15041 (April 7, 2025).[2] The Liberation Day Order imposed sweeping new tariffs: a global 10% tariff on nearly every country in the world, regardless of whether they impose tariffs on United States products, the rates at which they do so, or the existence of any trade agreements governing the relationship and, in addition, much higher tariff rates on dozens of countries based on what the administration claimed to be an estimate of "tariff and nontariff barriers," *id.*, but ultimately turned out to be a simple ratio of

---

[2] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/. *See* Fed. R. Evid. 201(b); *see also Tri Union Frozen Prods. v. United States*, 161 F. Supp. 3d 1333, 1337 (Ct. Int'l Trade 2016) ("the offered information is not subject to reasonable dispute because it is 'generally known' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'")

the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country. He followed this with additional orders modifying, suspending, or otherwise adjusting the Liberation Day tariffs in later orders. *See, e.g.*, Exec. Order No. 14,266, 90 Fed. Reg. 15,625 (April 15, 2025).[3]

As a statutory basis for both the Trafficking Order and the Liberation Day Order the President cited the International Emergency Economic Powers Act of 1977, 50 U.S.C. § 1701 et seq. ("IEEPA"). On May 28, 2025, this Court granted summary judgment invalidating the Trafficking and Liberation Day tariffs because IEEPA could not be read "to delegate an unbounded tariff authority to the President." *V.O.S. Selections, Inc. v. United States*, 722 F. Supp. 3d 1350, 1370 (Ct. Int'l Trade 2025). On February 20, 2026, the United States Supreme Court agreed. *Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 2026 LEXIS 714 (Feb. 20, 2026). "The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope," the Supreme Court explained. "In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it." *Id.* at *34.

**B. The Section 122 Tariffs**

The same day, smarting from his IEEPA defeat at the Supreme Court, the President announced that he would issue replacement tariffs under other statutory authorities. Later that day, the President issued Proclamation 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments*

---

[3] Available at https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/

*Problems*, (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation").[4] Claiming authority under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, the President imposed a 10% surcharge on goods imported into the United States—the same amount as the global reciprocal tariff imposed under the original Liberation Day order.

The Section 122 Proclamation asserts that "the United States faces fundamental international payments problems, such as large and serious balance-of-payment deficits, an imminent and significant depreciation of its currency in foreign exchange markets, or an international balance-of-payments disequilibrium." In the Proclamation, the President states that "senior officials have informed me that fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems."

"In other words," according to the Section 122 Proclamation, "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments out, on net, flowing out of the country than into the country."

The Section 122 Proclamation imposes the tariffs for 150 days; the maximum duration allowed under the statute without congressional approval. The Proclamation includes two Annexes detailing which categories of imports the new

---

[4] Available at https://www.whitehouse.gov/presidential-actions/2026/02/imposing-a-temporary-import-surcharge-to-address-fundamental-international-payments-problems/

5

tariffs apply to, as well as a variety of exempted products. Annex II consists of seventy-six pages of products exempted from the Proclamation's tariffs, including aircraft components, citrus juice, automobile components, semiconductors, and Acai. There are also exemptions for various countries including Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua.

The day after the Section 122 Proclamation, the President announced via social media post[5] that he was increasing the tariff rate to 15%, the maximum allowed by the statute. At the time of filing, it is unclear when or whether the rate change will go into effect. The 10% tariffs went into effect on February 24, 2026.[6]

## II. Section 122

In the wake of World War II, leaders from 44 countries met in Bretton Woods, New Hampshire and adopted a new global monetary system (the "Bretton Woods system"). Robert L. Hetzel, *Launch of the Bretton Woods System* (Fed. Reserve History, Nov. 22, 2013).[7] The U.S. dollar became the central currency of the world and other countries fixed (or "pegged") their currencies to the U.S. dollar at set exchange rates, and the U.S. promised to convert dollars into gold at a fixed exchange rate of $35 per ounce. *Id.* This created a potential problem: as the United States pushed more dollars into the world economy and foreign countries

---

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 9:59 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/116109447886304328
[6] U.S Customs and Border Protection, *CSMS # 67844987 – Imposing Temporary Section 122 Duties* (Feb. 23, 2026) (available at https://content.govdelivery.com/bulletins/gd/USDHSCBP-40b3b7b?wgt_ref=USDHSCBP_WIDGET_2)
[7] https://www.federalreservehistory.org/essays/bretton-woods-launched.

accumulated dollars in excess of their need for U.S. goods, conversion into gold became more attractive. If too many dollars were redeemed for gold at once, U.S. gold reserves would be depleted, and the United States might not be able to honor its commitments. *See Recent Changes in Monetary Policy and Balance-of Payments Problems: Hearings Before the H. Comm. on Banking & Currency*, 88th Cong., 2d Sess. 235 (1964). And the more countries traded their U.S. dollars for gold, the more other countries would do the same, fearing that the U.S. might not be able to meet its commitments, creating a "bank run" mentality.

That exact problem occurred in the early 1970s. The United States pushed a lot of dollars into the world economy to pay for, among other things, the Vietnam War and domestic programs like President Johnson's "Great Society," fueling a large and persistent deficit in the balance of payments. As countries started redeeming these dollars for gold, U.S. gold reserves began dwindling. *The Bretton Woods Agreements* 132 (Naomi Lamoreaux & Ian Shapiro eds., 2019) (By August 1971, "the United States held less than ten thousand metric tons of gold, less than half of what it once had). In 1971, President Richard Nixon suspended the conversion of dollars into gold and imposed, among other policies, temporary tariffs to mitigate the effects of that crisis—the "Nixon shock," Proclamation No. 4074, 85 Stat. 926 (1971). Nixon's tariffs were controversial—it was not at all clear where he claimed such authority. The predecessor to this Court in fact found those tariffs unlawful but was overturned by the predecessor of the Federal Circuit, which found the Nixon tariffs

acceptable under the Trading With the Enemy Act of 1917. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

After the Nixon Shock, world leaders tried to save the fixed-rate system, meeting at the Smithsonian Institution in Washington D.C., where they agreed that the U.S. would peg the dollar to gold at $38 per ounce, other countries would adjust their exchange rates to new fixed values to the dollar, and exchange rates were allowed a margin of fluctuation based on the new dollar value. *The Bretton Woods Agreements* at 136. But the Smithsonian Agreement didn't last long. In February 1973, the U.S. devalued the dollar again, raising the price of gold to $42.22 per ounce. *Id.* at 136–38. As a result, by the end of that year, many of the countries to the Smithsonian Agreement stopped pegging their currencies to the dollar and let them float—meaning the exchange rate to dollars of those currencies were determined by the market. *Id.* at 138. Thus, the world economy began operating under a floating exchange rate system.

Still, at that time, the United States had not abandoned the idea of a fixed rate exchange rate system—Bretton Woods was not officially ended—and many did not believe that a fixed exchange rate system would be permanently abandoned and the floating exchange rate system would continue to operate as the global monetary system.

As a result, Congress was concerned about the possibility of future large and persistent United States balance-of-payments deficits that might undermine a fixed-exchange-rate monetary system. Congress responded in 1974 by enacting

8

Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, authorizing temporary import surcharges like those President Nixon had imposed—but only under strict limitations.

Section 122 is titled "Balance-of-payments authority," and permits the President to impose "temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payment problems." 19 U.S.C. § 2132(a). Under Section 122, the President may impose tariffs for 150 days to address specific problems: either (1) "to deal with large and serious United States balance-of-payment deficits;" (2) "to prevent an imminent and significant depreciation of the dollar in foreign exchange markets;" or (3) "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." *Id.* The Section 122 Proclamation asserts authority only under the first category, claiming that the United States has a balance-of-payments crisis in the form of large and persistent trade deficits.

A tariff imposed under Section 122 must be "a temporary surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States . . . ." *Id.* The surcharge must be imposed "consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d). "Nondiscriminatory treatment" is defined as "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)." 19 U.S.C. § 2481(9). There is a limited exception to this nondiscrimination principle: if "the President determines that the purposes of this

9

section will best be served by action against one or more countries having large or persistent balance-of-payment surpluses, he may exempt all other countries from such action." 19 U.S.C. § 2132(d)(2).

Similarly, tariffs under Section 122 must have "broad and uniform application with respect to product coverage . . . ." 19 U.S.C. § 2132(e). A limited exception again applies "where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." *Id.* But, product exceptions "shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." *Id.* As if to underscore the limits of the authority granted by the statute, Section 122 stresses that "[n]either the authorization of import restricting actions nor the determination of exceptions with respect to product coverage shall be made for the purpose of protecting individual domestic industries from competition." *Id.*

## III. Plaintiffs' Injuries

### A. Injury to Burlap and Barrel, Inc.

Plaintiff Burlap and Barrel, Inc. ("Burlap & Barrel") imports unique spices grown naturally and sustainably from at least twenty-two countries including Afghanistan, Argentina, Barbados, Canada, Colombia, Costa Rica, Ethiopia, France, Grenada, Guatemala, Hungary, India, Indonesia, Mexico, Nepal, Nigeria, Peru, Spain, Sri Lanka, Tanzania, Turkey, and Vietnam. Decl. of Ethan Frisch

("Frisch Decl.") ¶¶ 4, 9, Exhibit A. The company's mission is to end inequality and exploitation in the spice industry by building supply chains that are equitable, transparent, and traceable. *Id.* at ¶ 3.

To do this, Burlap & Barrel connects spice farmers around the world to U.S. consumers, helping smallholder farmers generate a larger share of their products' value, and establishing long-term, mutually beneficial partnerships with suppliers. *Id.* at ¶ 4. By sourcing directly from small farms, Burlap & Barrel eliminates the cost of unnecessary intermediaries, meaning that farmers can make up to ten times more than the commodity price for their products, even while offering top quality spices to American consumers at accessible prices. *Id.*

While some of the spices Burlap & Barrel sells are produced domestically, and others—like cinnamon, black peppercorns, and vanilla—are listed as exempt products on Annex II of the Section 122 Proclamation, many spice plants can only be found or cultivated in specific climates or regions around the world due to climate and geography. *Id.* at ¶¶ 6–11. Burlap & Barrel also imports unique heirloom varieties of spices that cannot be grown domestically, like purple stripe garlic from Vietnam, flowering hyssop thyme from Turkey, and unique herbs from Provence, France. *Id.* at ¶ 11. There are unique international varietals of many spices considered staples of American cuisine such as savory, oregano, rosemary, and thyme, all of which are subject to the Section 122 tariffs. *Id.* at ¶ 8.

Burlap & Barrel cannot avoid the tariffs by switching to U.S.-grown alternatives. As a direct-to-consumer business, Burlap & Barrel's customers seek

11

out unique international varieties that are popular among the company's customers. *Id.* at ¶ 11.

The company refrained from passing on the cost of the IEEPA tariffs to its customers, eating the cost itself. But by driving up costs, the Section 122 tariffs will force Burlap & Barrel to reduce investment in the United States by scaling back hiring, shipping, and the production of corrugated packaging. *Id.* at ¶ 12. These tariffs have forced the company to pause spending on innovation, halting new product development, new partnerships with restaurants and celebrity chefs, and special projects like a much-requested spice advent calendar. *Id.* at ¶ 13. While Burlap & Barrel has held the line for many staple spices at less than $10 per unit, it is now also weighing price increases—a move that would violate its longstanding commitment to keeping necessary grocery ingredients accessible at a cost of only pennies per serving. *Id.*

Burlap & Barrel currently has three shipments scheduled to arrive in the next few weeks on which it will have to pay the tariffs imposed by the Section 122 Proclamation. *Id.* at ¶ 15. The expected tariff on these shipments is $17,273 on goods valued at $172,732, payable upon arrival at the Port of New York and New Jersey and the Port of Baltimore, Maryland. *Id.* at ¶¶ 15–16. Over the next 150 days, Burlap & Barrel expects to pay at least $60,000 in tariffs.

The tariffs have already impacted Burlap & Barrel's business through lost profits, higher shipping costs, cash flow issues, inventory fluctuations due to supply chain uncertainty, and lost customers, partners, and contracts due to inventory

shortages. *Id.* at ¶ 18. These impacts will only continue while the Section 122 tariffs are in effect.

**B. Injury to Basic Fun, Inc.**

Plaintiff Basic Fun, Inc. ("Basic Fun!") designs, markets, and sells toys and games, including classic brands such as Tonka®, Care Bears®, Lincoln Logs®, Lite-Brite®, and other well-known children's products through major retailers like Walmart, Target, and Amazon. Decl. of Jay Foreman ("Foreman Decl."), ¶ 5, Exhibit B. The Florida-based company employs approximately 105 people in the United States, and imports components and finished products necessary to manufacture and distribute its toys to retailers across the United States from China. *Id.* at ¶¶ 3, 6.

Less than 10% of toys purchased in the United States are manufactured domestically. *Id.* at ¶ 11. The U.S. lacks the supplier network, labor force, and manufacturing infrastructure to support large-scale domestic production of toys and the industry relies on a highly specialized supply chain concentrated overseas. *Id.* at ¶¶ 9, 11. Basic Fun! relies on this global supply chain to manufacture toys efficiently and safely because the suppliers, testing facilities, and manufacturing capabilities necessary to produce these products are not reasonably available domestically. *Id.* at ¶ 10.

Because Basic Fun! sells its products to large retailers with substantial bargaining power, the company is often unable to raise prices to offset tariff costs, meaning that tariffs significantly reduce its profit margins. *Id.* at ¶ 16. In some instances, Basic Fun! must continue filling retailers' orders even when tariffs

eliminate the company's profit on those sales to maintain its position with major retailers and keep its products on shelves. *Id.* at ¶ 17. Because tariffs can change suddenly and unpredictably, Basic Fun! has difficulty determining the appropriate prices for its products when negotiating with retailers months in advance, planning its business operations, and forecasting earnings. *Id.* at ¶¶ 18–19.

Currently, Basic Fun! has approximately 104 shipping containers of toys and components scheduled to arrive in the United States during the 150-day tariff period. *Id.* at ¶ 7. The company must pay the applicable tariffs when its goods enter the country through the customs entry process and cannot be released into the United States without payment. *Id.* at ¶ 15. The value of Basic Fun!'s imports is approximately $6.9 million, on which it expects to pay approximately $690,000 in Section 122 tariffs. *Id.* at ¶¶ 7–8. If the tariffs continue, Basic Fun! expects to pay $8.2 million in tariffs this year, which increases to $12.5 million if the President follows through with his threat of raising the rate to 15%.

Because Basic Fun! cannot make reliable financial projections, it has had to delay or cancel potential acquisitions and growth opportunities, freeze hiring, reduce bonuses, and limit new investments into its business. *Id.* at ¶¶ 20–21. In addition, reduced earnings due to the tariffs affect the company's financing. The company is at greater risk of breaching loan covenants, which could require renegotiation of financing terms at a higher cost to Basic Fun!. *Id.* at ¶ 22.

## Legal Standard

To obtain injunctive relief a party must demonstrate: "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest." *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1336–1337 (Ct. Int'l Trade 2024) (citing *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)).

Summary judgment is appropriate where there are no material facts in dispute and the case at hand hinges on pure questions of law. *Suntec Indus. Co. v. United States*, No. 13-00157, 2016 Ct. Intl. Trade LEXIS 40, *4 (Ct. Int'l Trade Apr. 21, 2016) (relying on *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* USCIT R. 56(a).

## Summary of the Argument

Once again, this Court is asked to rule on this administration's imposition of tariffs based on dubious statutory authority. In explicit response to the decision of this Court invalidating his worldwide tariff regime under the International Emergencies Economic Powers Act (IEEPA), affirmed by both the Federal Circuit and Supreme Court, the current administration has attempted to reimpose those tariffs under a different statutory authority: Section 122 of the Trade Act of 1974, 19 U.S.C. 2132.

But Section 122 does not license the administration's trade war either: it was only intended by Congress to be used in the face of a balance-of-payments crisis,

such as the one the United States experienced under the Bretton Woods system—but that system no longer obtains. Under present economic conditions, it is effectively *impossible* for the balance of payments to end up in any kind of real or significant deficit—and currently the deficit of the balance of payments is effectively a rounding error. Nor have Defendants adhered to the strict requirements of Section 122, which require that tariffs be generally uniform and nondiscriminatory. Indeed, if this sort of capricious tariff authority *was* granted by Congress, that itself falls afoul of the limitations imposed by our constitutional order on delegations from the legislature to the executive—because the power claimed here by Defendants is limited by no principle, intelligible or otherwise.

Therefore, this Court should enjoin the tariffs set forth in the Section 122 Proclamation.

# Argument

## I.    The tariffs imposed by the President's Section 122 Proclamation exceed his lawful authority.

Under the Constitution, Congress holds the powers to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl. 1, 3. The President enjoys no inherent authority to impose tariffs during peacetime. *Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 2026 LEXIS 714, at *17 (Feb. 20, 2026). The President can therefore exercise such authority only if it is delegated to him by the legislature.

### A. Section 122 does not authorize the President to impose the challenged tariffs.

IEEPA does not grant the President the authority to impose tariffs and the President's tariffs issued under IEEPA were held unlawful. *Learning Res.,* 2026 LEXIS 714. So the President turned to Section 122. Unlike IEEPA, Section 122 does delegate *some* tariff authority to the executive—but only under particular circumstances—and not circumstances that exist now.

The relevant portion of Section 122 applies *only* where "fundamental international payments problems require special import measures to restrict imports . . . to deal with large and serious United States balance-of-payments deficits."[8] 19 U.S. Code § 2132(a). Under such circumstances—and only such circumstances—"the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)," one of several options. *Id.* He can impose "a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States." 19 U.S. Code § 2132(a)(A). And this authority delegated to the president is subject to specific limits as well: Import restricting actions proclaimed pursuant to subsection "shall be applied consistently with the principle of nondiscriminatory treatment".  19 U.S. Code § 2132(d). "Nondiscriminatory treatment" is a defined term, meaning "trade treatment based on normal trade

---

[8] The two other situations Section 122 imagines, "to prevent an imminent and significant depreciation of the dollar in foreign exchange markets," or "to cooperate with other countries in correcting an international balance-of-payments disequilibrium," do not apply, and therefore the Section 122 Proclamation does not invoke them.

17

relations (known under international law as most-favored-nation treatment)." 19 U.S.C. § 2481(9). Section 122 also requires that "Import restricting actions proclaimed pursuant to subsection (a) shall be of broad and uniform application with respect to product coverage except . . . [for] unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." 19 U.S. Code § 2132(e).

The historical context of Section 122 confirms that Congress intended to address balance-of-payments deficits within the then-prevailing fixed-exchange-rate system. *See* Facts, Section II, *supra*. By providing a clear statutory basis for such actions, Congress sought to resolve the "unsure legal footing" that characterized the era's executive interventions. *Cf. United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 582 n.33 (C.C.P.A. 1975) ("A surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute [Section 122] now governing the action.")

But Congress was sure to place strict limitations on the President's use of the powers in Section 122: to combat balance of payments deficits, the President could take certain "special import measures to restrict imports" for 150 days, up to a max of 15%, with strict limits on discrimination among countries or goods (because a balance of payments deficit is generally not the result of specific countries or goods, it is rather a general challenge to America's public fisc). Congress did not intend for Section 122 to empower the President to impose tariffs for any reason he likes.

18

Defendants have not adhered to these limits. There are no "fundamental international payments problems" that "require special import measures to restrict imports." There is no "large and serious United States balance-of-payments deficit[]." The current U.S. balance-of-payments discrepancy of approximately $53 billion represents only 0.2 percent of GDP—a figure so statistically insignificant in a multi-trillion-dollar economy that it cannot be characterized as "large and serious" as required by Section 122. *See U.S. Bureau of Econ. Analysis, U.S. International Transactions Release—Additional Information*, https://www.bea.gov/news/trans-release-additional-information (last visited Mar. 13, 2026) (defining "statistical discrepancy").

The President attempts to conflate the balance-of-trade deficit with a balance-of-payments deficit to justify his actions under the Section 122 Proclamation. But "balance of trade" and "balance of payments" are distinct concepts. A trade deficit, or balance-of-trade deficit, occurs when the value of goods imported from another country exceeds the value of U.S. exports to that country. But balance of payments is a broader concept: accounting for *all* the economic transactions that take place between the United States and the rest of the world, including trade in services, investment income, and transfers. The trade deficit in goods is only one component of the overall balance of payments.

Congress understood the distinction between "balance-of-payments" and "balance-of-trade" when it adopted Section 122. *See* S. Rep. No. 93-1298, Trade

Reform Act of 1974, H.R. 10710, at 8–9 (1974).[9] Table 3 of that Senate Report lists the U.S. trade balance and balance of payments from 1960 to 1974 in separate columns, indicating that they are two separate categories. The 1963 report from the Joint Economic Committee explained, "[t]he [balance-of-payments] deficit under the official U.S. definition, measures the reduction in U.S. . . . monetary reserve assets (chiefly gold) and the increase in liquid liabilities. Stated another way, it measures the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities." Joint Economic Committee, 88th Congress, "The United States Balance of Payments-Perspectives and Policies," November 12, 1963.

This was also the understanding of prior administrations, when they communicated with Congress. In 1984 the Senate trade subcommittee sent Council of Economic Advisors chair Marty Feldstein an inquiry as to whether Section 122 could be invoked to counter a common trade deficit. Feldstein answered with an unequivocal no, offering a detailed explanation of how this was a confusion of terminology:

> [S]ection 122 appears not even to apply to the current situation. The specific language of that section provides for the imposition of a tariff surcharge under two conditions: To deal with large and serious balance of-payments deficits, and second, To prevent an immediate and significant depreciation of the dollar in foreign exchange markets. Now, although we have a trade deficit and a current account deficit, we do not have a balance-of-payments deficit, in the strict sense envisioned in section 122. The technical definition for the balance-of-payments is the rate of accumulation of official reserve assets, including gold.

---

[9] https://www.finance.senate.gov/imo/media/doc/trade10.pdf.

*Trade Deficit and the Economy: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Finance*, 98th Cong. (1984) (statement of Martin Feldstein, Chairman, Council of Economic Advisers).

The term "balance-of-payments" had a clear meaning understood by Congress, which was distinct from "balance of trade." Congress did not intend for these terms to be used interchangeably, and it did not intend Section 122 to be used to address a simple trade deficit. *See* 119 Cong. Rec. H40,506 (Dec. 10, 1973) ("The authority to implement import restricting measures . . . cannot be used for the purpose of protecting individual domestic industries from import competition."). The Supreme Court has long held that "a tax cannot be imposed without clear and express words for that purpose." *United States* v. *Isham*, 84 U.S. (17 Wall.) 496, 504 (1873); *see also Hartranft* v. *Wiegmann*, 121 U.S. 609, 616 (1887) (holding that any statutory ambiguity with respect to tariffs must "be resolved in favor of the importer, 'as duties are never imposed on the citizen upon vague or doubtful interpretations'"). Here, Section 122 does not provide clear and express words that the powers it provides the president can be used to address a trade deficit.

No President, until now, has attempted to invoke Section 122. That's because the "fundamental international payments problems" that Congress was concerned about when it passed Section 122—a balance-of-payments crisis that could lead to foreign countries trading in their U.S. dollars for gold and depleting the U.S. gold reserves, *see* Facts, Section II, *supra*.—cannot occur in our current floating exchange rate monetary system. This is the prevailing consensus among

economists, who recognize that "a system of floating exchange rates completely eliminates the balance-of-payments problem—just as in a free market there cannot be a surplus or a shortage in the sense of eager sellers unable to find buyers or eager buyers unable to find sellers. The price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis." Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967).

In adopting Section 122, Congress was specifically concerned about a balance-of-payments crisis under a fixed-exchange-rate monetary system—a scenario in which foreign countries would rush to exchange their dollars for gold, depleting U.S. gold reserves and threatening to collapse the entire world monetary system. A trade deficit today, under a floating-rate monetary exchange system, does not present the same concerns—the United States has had a trade deficit almost every year since Section 122 was passed, hardly the crisis Congress envisioned when it adopted Section 122. Indeed, the U.S. trade deficit in today's economy is not necessarily a problem at all. A trade deficit merely signifies that Americans purchase more from a particular country than that country's citizens purchase from the United States. Because many of these nations are comparatively poor, their populations lack the financial means to import high-priced American goods at the same volume that Americans consume their exports. The mainstream economic consensus is that trade deficits aren't usually a problem at all, much less an emergency requiring historic tariffs be imposed on every country in the world—including many countries with which the United States has a trade surplus. James McBride and Andrew

Chatzky, *The U.S. Trade Deficit: How Much Does It Matter?*, Council on Foreign
Relations (2019).[10]

There is reason to believe that Defendants understand that Section 122 does not
authorize the actions taken by the Section 122 Proclamation. During the litigation
over the President's IEEPA tariffs, the Solicitor General agreed with Plaintiffs'
point here that Section 122 does not apply to the facts at hand: "Nor does [Section
122] have any obvious application here, where the concerns the President identified
in declaring an emergency arise from trade deficits, which are conceptually distinct
from balance-of-payments deficits." Reply Br. for Appellants, *V.O.S. Selections, Inc.
v. Trump*, Federal Cir. No. 25-1812, at 13. While not necessarily dispositive,
Defendants' complete 180 on the application of Section 122 to the facts at hand
should give this Court pause in determining that Section 122 confers a much
broader power than any president—including this one only months ago—thought it
did.

Section 122's text, historical context, economic consensus, and the problem it
sought to address—and indeed, Defendants' own words—all support the conclusion
that the Section 122 Proclamation exceeds the President's authority to impose
tariffs Congress granted under Section 122.

And the Section 122 Proclamation also violates the provisions of Section 122 that
require uniformity and nondiscrimination: the Annexes to the Section 122
Proclamation list pages of exemptions, with no findings whatsoever to meet the

---

[10] https://www.cfr.org/backgrounder/us-trade-deficit-how-much-does-it-matter

statutory requirements of Section 122. These Annexes demonstrate Defendants'
actual goal: to reimpose the capricious tariff regime imposed via IEEPA, under
which the administration claimed for itself the right to unilaterally adjust tariffs to
fulfill other policy goals—but that is not the authority Section 122 provides.

### B.    This Court should not grant presidents such sweeping authority without clear Congressional authorization.

The Supreme Court has explained that courts should not lightly presume
congressional intent to implicitly delegate decisions of major economic or political
significance to agencies. *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120,
160 (2000); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (plurality)
("When an agency claims to discover in a long-extant statute an unheralded power
to regulate a significant portion of the American economy, we typically greet its
announcement with a measure of skepticism."). And these tariffs are of
unprecedented significance: In 2024, United States imports were approximately $3
trillion, which means that a 10% tariff would have amounted to roughly $300 billion
in new taxes, assuming the amount of imports did not itself adjust in the face of
higher tariff rates—imposed at the President's caprice, without notice or public
comment, and subject to change at any point based on his whims. Peter E. Harrell,
*The Case Against IEEPA Tariffs*, LAWFARE, Jan. 31, 2025.[11] Current estimates are
that the IEEPA tariffs—which included ever-changing exemptions and
postponements, reducing the overall intake—generated about $175 Billion in tariff
revenue (that now must be paid back). Lysle Boller, et. al, "Supreme Court Tariff

---

[11] https://www.lawfaremedia.org/article/the-case-against-ieepa-tariffs

Ruling: IEEPA Revenue and Potential Refunds," Penn Wharton Budget Model, Feb. 20, 2026.[12] This amounted to a tax of approximately $1,000 per U.S. household. Erica York & Alex Durante, "Tariff Tracker: Impact of Trump Tariffs & Trade War by the Numbers," Tax Foundation, February 23, 2026.[13]

The new Section 122 tariffs are projected to apply to $1.2 trillion, or 34%, of annual imports, and between $200 and $600 additional tax burden per U.S. household. *Id.* The Federal Reserve estimates that U.S. businesses and consumers absorbed approximately 90% of the cost of the IEEPA tariffs. Mary Amiti, et. al, "Who Is Paying for the 2025 U.S. Tariffs?", Federal Reserve Bank of New York, February 12, 2026.[14] There is no reason to believe the incidence of the new Section 122 tariffs will be any different.

These impacts are at least as large as recent executive actions that the Supreme Court has found to be "major questions" requiring a clear statement by Congress to authorize executive discretion. *See, e.g., Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) (EPA authority to regulate carbon emissions where the administration had not offered a specific emission reduction plan); *NFIB v. OSHA*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of*

---

[12] https://budgetmodel.wharton.upenn.edu/p/2026-02-20-supreme-court-tariff-ruling/
[13] https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/
[14] https://libertystreeteconomics.newyorkfed.org/2026/02/who-is-paying-for-the-2025-u-s-tariffs/

*Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

And this is an instance where the President is claiming to exercise a core, enumerated legislative power; under our Constitution, Congress holds the powers to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl. 1, 3. The President can therefore exercise such authority *only* if it is in fact delegated to him by the legislature. But in "the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. API,* 448 U.S. 607, 645 (1980); *see also Learning Res., Inc. v. Trump*, Nos. 24-1287, 25-250, 2026 LEXIS 714, at *17 (Feb. 20, 2026) ("The Government thus concedes, as it must, that the President enjoys no inherent authority to impose tariffs during peacetime.").

In *Alabama Association of Realtors*, the Supreme Court explained that the Centers for Disease Control and Prevention could not unilaterally grant itself control of the nation's housing market by issuing a nationwide eviction moratorium. Such sweeping authority must come, if at all, from Congress. *Ala. Ass'n of Realtors*, 594 U.S. at 760. There, as here, the government's reading of the statute was far too permissive, contending that the statute gave it "broad authority to take whatever measures it deem[ed] necessary to control the spread of COVID-19." *Id.* at 763. "It

strains credulity to believe that this statute grants the [President] the sweeping authority that [he] asserts." *Id.* at 760.

Here, the President has attempted to reimpose his global 10% (and potentially 15%) tariffs to reduce the trade deficit that concerns him. But Congress strictly limited the power granted in Section 122—the authority to impose up to a 15% tariff on imports from around the world—to a specific circumstance that does not exist now and, under current economic conditions, effectively cannot arise. To fit Section 122, Defendants are forced to play games with its language, recasting a trade deficit as a balance-of-payments crisis. The two, however, are not the same and do not even strongly correlate.

As the Supreme Court recognized, in each portion of the United States Code where Congress has delegated tariff authority to the president, Congress has placed strict limitations on the exercise of that authority. *Learning Res*., 2026 LEXIS 714, at *19; *See* 19 U.S.C. § 1862 (providing a framework under which the President can adjust duties and import restrictions for "safeguarding national security," including a full administrative process in which the Secretary of Commerce, in consultation with the Secretary of Defense, investigates and makes a formal report to the President, who determines whether to act on that report, and provision for specific forms of congressional oversight); 19 U.S.C. § 2411 (providing a framework for imposing tariffs when some trading partner is breaking the rules); 19 U.S.C. § 2251 (authorizing the President to protect specific domestic industries by imposing tariffs "which the President determines will facilitate efforts by the domestic industry to

27

make a positive adjustment to import competition and provide greater economic and social benefits than costs"). Section 122 is no different—it only grants the President this authority "to deal with large and serious United States balance-of-payments deficits," not to combat trade deficits. Indeed, the prior IEEPA tariff regime, which the president seeks to maintain by this proclamation, actually *increased* the trade deficit in goods rather than decreasing it. Erica York & Alex Durante, "Tariff Tracker," *supra*. ("the goods deficit actually increased by $25.5 billion year over year.")

If nothing else, the canon of constitutional avoidance counsels against adopting a radically expansive vision of the President's tariff powers under Section 122. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *see also Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."). The President's preferred interpretation raises substantial constitutional issues regarding the delegation of unlimited authority to the executive. *See* Section I.C.

But a constitutionally dubious reading of Section 122 can be avoided. A straightforward reading of Section 122 shows that it does not confer the vast

discretionary tariff authority the President claims. Rather, Congress enacted Section 122 to address a very specific problem—the balance-of-payments crisis that arose in the early 1970s under a fixed-exchange-rate monetary system—and it imposed explicit limits to ensure such authority would be used only in comparable circumstances. The United States has not faced such a crisis since, which is why no prior president has ever invoked Section 122 until now.

### C. If Section 122 did authorize the President to impose these tariffs, that would be an unconstitutional delegation of legislative power to the executive.

If Section 122 truly conferred the sweeping and unreviewable authority Defendants claim, it would represent an impermissible delegation of legislative power to the executive. "The Government's theory would give [the President] power to impose enormous costs that might produce little, if any, discernible benefit." *Indus. Union Dep't*, 448 U.S. at 645. Such an interpretation of Section 122 would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *Id*. at 646 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

The Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors*, 594 U.S. at 764. Defendants interpret Section 122 to allow the President to impose immediate worldwide tariffs to combat a balance-of-payments deficit that does not exist, delegating to the executive plenary power to singlehandedly upend the entire global economy, void treaty obligations Congress has ratified, and leave

the public in a perpetual state of chaos and uncertainty. This interpretation would render Section 122 at least the equivalent of the delegations the Supreme Court previously enjoined as unconstitutional—"one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001). If the standards laid down by Congress to limit this authority can be interpreted this capriciously, then they represent no intelligible principle to cabin the president's discretion.

"The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). The opening sentence of the Constitution specifies, "All legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. The doctrine is at bottom an attempt to take this provision seriously: there are legislative powers to make laws, and "all" such power resides in the Congress. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 74 (2015) (Thomas, J., concurring) ("[T]he separation of powers is, in part, what supports our enduring conviction that the Vesting Clauses are exclusive and that the branch in which a power is vested may not give it up or otherwise reallocate it.").

The President does not have legislative power. The Constitution provides that "[t]he *executive* Power shall be vested in a President." U.S. Const. art. II, § 1, cl. 1

(emphasis added). Implicit in this arrangement is the premise that neither branch may delegate its sphere of power to any other. "The Vesting Clauses, and indeed the entire structure of the Constitution, make no sense [if there is no limit on delegations]." Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 340 (2002). "Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that the legislative power over trade cannot be abdicated or transferred to the Executive." *Am. Inst. for Int's Steel, Inc. v. United States,* 376 F.Supp.3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante).

The premise that these powers must be separated, and delegations avoided, is not a modern invention. It predates the founding. Commentators as far back as the English Jurist Lord Coke affirmed that the King could not "change any part of the common law, nor create any offence by his proclamation, which was not an offence before, without Parliament." *Ass'n of Am. R.R.*, 575 U.S. at 72 (Thomas, J., concurring) (quoting Case of Proclamations, 12 Co. Rep. 74, 75, 77 Eng. Rep. 1352, 1353 (K.B. 1611)). William Blackstone, in his influential *Commentaries*, likewise argued that when "the right both of making and of enforcing the laws . . . are united together, there can be no public liberty." 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 142 (1765). John Adams, in drafting the Massachusetts state constitution, expressly provided that "[t]he executive shall never exercise the legislative and judicial powers . . . to the end it may be a government of laws and not of men." Mass. Const. pt. 1, art. XXX. James Madison warned, "The

accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47 (James Madison).

Early Supreme Court cases likewise recognize this principle, with Chief Justice Marshall declaring, "[i]t will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825). Indeed, some years later the Court stated "[t]hat Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *cf. J.W. Hampton, Jr. &Co. v. United States*, 276 U.S. 394, 406 (1928) ("it is a breach of the National fundamental law if Congress gives up its legislative powers and transfers it to the President").

Recognizing these concerns, the Supreme Court has a long-developed doctrine limiting Congress's discretion to delegate its legislative prerogatives. The doctrine works to ensure "that important choices of social policy are made by Congress, the branch of our Government most responsive to the popular will." *Indus. Union Dep't*, 448 U.S. at 685 (Rehnquist, J., concurring) (internal citation omitted). Any rulemaking authority delegated by Congress must therefore include an "'intelligible principle' to guide the exercise of the delegated discretion." *Id.* at 686. This "ensures that courts charged with reviewing the exercise of delegated legislative discretion

will be able to test that exercise against ascertainable standards." *Id. See also Schechter Poultry Corp.*, 295 U.S. at 529; *Panama Refining Co.*, 293 U.S. at 430.

The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)). The onus is on Congress to "expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting denial of certiorari). Congress cannot "merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals." *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting).

Of course, "no statute can be entirely precise, and . . . some judgments, even some judgments involving policy considerations, must be left to the officers executing the law and to the judges applying it." *Mistretta*, 488 U.S. at 415 (Scalia, J., dissenting). But this is not a reason to abandon the exercise because courts "may not—without imperiling the delicate balance of our constitutional system—forgo [their] judicial duty to ascertain the meaning of the Vesting Clauses and to adhere to that meaning as the law." *Ass'n of Am. R.R.*, 575 U.S. at 76 (Thomas, J., concurring). Even where a line is not readily apparent, "the inherent difficulty of line-drawing is no excuse for not enforcing the Constitution." *Id.* at 61 (Alito, J.,

concurring). The failure to enforce these requirements undermines democratic trust and accountability since "the citizen confronting thousands of pages of regulations— promulgated by an agency directed by Congress to regulate, say, 'in the public interest'—can perhaps be excused for thinking that it is the agency really doing the legislating." *Id*. at 62 (Alito, J., concurring) (quoting *Arlington v. FCC*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting)).

Our constitutional structure requires that each Congressional enactment "furnish[ ] a declaration of policy or a standard of action." *Panama Ref. Co*., 293 U.S. at 416. It falls to Congress, and Congress alone, to "establish primary standards, devolving upon others the duty to carry out the declared legislative policy." *Id*. at 426. Courts, therefore, must reject regimes in which they find "an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426. The President's assertion of authority here has no meaningful limiting standards, essentially enabling him to impose any tariff rate he wants on any country at any time, for virtually any reason. The power claimed here is clearly legislative authority—indeed, Article I explicitly reserves the setting of tariffs, duties, and other taxes to Congress. If the President is to exercise such power at all, he can only do so by receiving a delegation of that enumerated congressional authority.

The President's claim of authority here is even more troubling than other delegations the courts have considered. Many of those prior examples were at least

subject to administrative process: there was notice, comments were heard, and time was taken to consider the merits of the proposal. But here the President operated under no such encumbrances and imposed tariffs by proclamation that went into effect almost immediately.

Delegating this sort of unreviewable, free ranging discretion to the executive with no oversight endangers our economy, and ultimately the liberty guaranteed to each of us as citizens, as past failures to uphold these principles should remind us. *See, e.g.*, *Hirabayashi v. United States*, 320 U.S. 81, 104 (1943) (approving the delegation of authority to military commanders to intern citizens of Japanese descent).

This Court should therefore find that any such authority, if it has been granted to the President, is an unconstitutional delegation of legislative power that must be struck down.

## II.    Plaintiffs will suffer irreparable harm if the President's Section 122 tariffs are not enjoined.

"Irreparable harm includes 'a viable threat of serious harm which cannot be undone.'" *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (Ct. Int'l Trade 2018) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)). Although generally claims of financial loss do not constitute irreparable harm, *Sampson v. Murray*, 415 U.S. 61, 90 (1974), "bankruptcy or a substantial loss of business may constitute irreparable harm because those events render a final judgment ineffective and deprive movant of 'meaningful judicial review.'" *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade

35

2024) (citing *Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1307
(Ct. Int'l Trade 2017)). "'Price erosion, loss of goodwill, damage to reputation, and
loss of business opportunities may also constitute irreparable harm in some
circumstances." *Id.* (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930
(Fed. Cir. 2012)); *see, e.g., Confederación de Asociaciones Agrícolas del Estado de
Sinaloa, A.C. v. United States*, 389 F.Supp.3d 1386, 1398 (Ct. Int'l Trade 2019).

Without an injunction issued by this Court, Plaintiffs will suffer irreparable
harm.

Burlap & Barrel will suffer irreparable harm from the President's Section 122
tariffs. It cannot avoid the tariffs by switching to U.S.-grown alternatives. Many
spices that it imports are not grown domestically and can only be found or
cultivated in specific climates or regions around the world due to climate and
geography. Frisch Decl. at ¶¶ 6–11. Burlap & Barrel also imports unique heirloom
varieties of spices that cannot be grown domestically. *Id.* at ¶ 11. Burlap & Barrel's
customers seek out unique international varieties that are popular among the
company's customers. *Id.*

By driving up costs, the Section 122 tariffs will force Burlap & Barrel to reduce
investment in the United States by scaling back hiring, shipping, and the
production of corrugated packaging. *Id.* at ¶ 12. The Section 122 tariffs will also
force it to pause spending on innovation, and halt new product development, new
partnerships with restaurants and celebrity chefs, and special projects. *Id.* at ¶ 13.
While Burlap & Barrel has held the line for many staple spices at less than $10 per

unit, because of the tariffs it is now also weighing price increases—a move that would violate its longstanding commitment to keeping necessary grocery ingredients accessible at a cost of only pennies per serving. *Id.*

The Section 122 tariffs will result in lost profits, higher shipping costs, cash flow issues, inventory fluctuations due to supply chain uncertainty, and lost customers, partners, and contracts due to inventory shortages. *Id.* at ¶ 18.

Basic Fun! will suffer irreparable harm because of President Trump's Section 122 tariffs. It relies on this global supply chain to manufacture toys efficiently and safely because the suppliers, testing facilities, and manufacturing capabilities necessary to produce these products are not reasonably available in the U.S. Foreman Decl. at ¶ 10.

Because Basic Fun! sells its products to large retailers with substantial bargaining power, the company is often unable to raise prices to offset tariff costs, meaning that tariffs significantly reduce, or even eliminate, its profit margins. *Id.* at ¶¶ 16–17. Because of these lost profits, the company is at greater risk of breaching loan covenants, which could require renegotiation of financing terms at a higher cost to Basic Fun!. *Id.* at ¶ 22.

Because of the tariffs, Basic Fun! has had to delay or cancel potential acquisitions and growth opportunities, freeze hiring, reduce bonuses, and limit new investments into its business. *Id.* at ¶¶ 20–21.

What's more, both companies are projected to pay tens of thousands of dollars in Section 122 tariffs in the coming months—about $60,000 in tariffs over the next 150

days for Burlap & Barrel, Frisch Decl. at ¶¶ 15–16 and about $690,000 in tariffs over the next 150 days for Basic Fun, Foreman Decl. at¶¶ 7–8—and if the IEEPA tariffs are any guide, that money will be difficult or impossible to recover any time soon. Despite repeated representations in the IEEPA cases, including before this Court, that refunds would be available if the IEEPA tariffs were struck down, the administration has in practice made recovery of those unlawful tariffs slow and difficult. Megan Messerly & Daniel Desrochers, "Trump's next tariff fight: Keeping the money," Politico, February 26, 2026.

## III.    The balance of interests weighs in favor of enjoining the President's Section 122 tariffs and an injunction serves the public interest.

As noted, Plaintiffs face irreparable harm in the absence of an injunction. The government, on the other hand, would not be harmed by an injunction preventing it from imposing unlawful tariffs because "[o]f course the government has no legitimate interest in upholding an unconstitutional system" or requirement. *United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971) (Brennan J., concurring).

Moreover, any purported hardship from the loss of funds that would otherwise be generated from the tariffs does not outweigh the injury suffered by the Plaintiffs. Tariffs have not historically been viewed as a primary way to raise revenue since the introduction of income taxes in 1913. *See* Joseph Bishop-Henchman, *High Protective Tariffs Have Been Short-Lived in American History*, Cato Institute, Apr.

8, 2025.[15] And further, the Section 122 Proclamation itself does not cite raising revenue as a justification for the tariffs.

And granting an injunction is in the public interest. "The public interest is served by ensuring that governmental bodies comply with the law and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Further, granting an injunction would serve the public interest because many other businesses are suffering and will continue to suffer from these tariffs. Small businesses are particularly vulnerable as they are less equipped to absorb the extra cost of tariffs. Close to two thirds of small businesses have reported that tariffs and other trade issues would hurt their businesses. Ruth Simon, *Small Sellers of Fireworks, Ski Apparel and Other Imports Can't Escape Tariff War*, Wall St. J., Apr. 11, 2025.[16] American consumers, too, will face dire consequences if the tariffs are not enjoined. Prices will continue to increase for nearly every product purchased by everyday Americans. And tariffs are likely to lead to higher inflation, which will decrease the purchasing power of everyday American consumers, exacerbating the effect of the rising cost of consumer goods on American households.[17]

---

[15] Available at https://www.cato.org/blog/high-protective-tariffs-have-been-short-lived-american-history
[16] Available at https://www.wsj.com/economy/trade/smallest-businesses-are-biggest-losers-in-global-tariff-war-f4df62d5
[17] Akrur Barua and Michael Wolf, *Tariffs will impact the economy and so will uncertainty*, Deloitte Global Economics Research Center, April 11, 2025, available at https://www2.deloitte.com/us/en/insights/economy/spotlight/united-states-tariffs-impact-economy.html

As to any interest the public may have in the policy underlying President Trump's invocation of Section 122, "[t]he issuance of an injunction does not undermine that interest, it merely maintains the status quo." *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021).

This Court should exercise its discretion under Rule 65(c) to require no bond. Courts routinely waive the security requirement where, as here, plaintiffs seek to restrain unlawful government action and an injunction serves the public interest. *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (bond unnecessary when "the balance of equities tips sharply in the plaintiffs' favor" and the injunction protects statutory or constitutional rights); *Nat'l Treasury Emps. Union v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268, at *59 (D.D.C. Apr. 28, 2025) (waiving bond where plaintiffs challenged an unprecedented Executive Order and the injunction protected the public interest).

Those circumstances apply with even greater force here. The Section 122 tariffs represent an unprecedented assertion of unilateral tariff authority, their economic impact is nationwide, and they inflict immediate and irreparable harm on Plaintiffs and thousands of similarly situated businesses. Because the Government faces no cognizable harm from compliance with a lawful injunction, and because requiring a bond would chill meritorious challenges to unlawful executive action, no bond should be required.

# Conclusion

For the reasons set forth herein, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Preliminary Injunction and/or issue summary judgment in favor of Plaintiffs and permanently enjoin the imposition of tariffs set forth in the Section 122 Proclamation and grant other just relief as this Court may deem just or proper. A proposed order is attached.

Dated: March 13, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org

# Certificate of Compliance

I, Jeffrey Schwab, hereby certify that this brief complies with the 14,000-word limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) and this Court's March 12, 2026 Order (see Dkt. 8), because this brief contains 9,894 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted

Dated: March 13, 2026

/s/ Jeffrey M. Schwab
Jeffrey M. Schwab
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org

*Counsel for Plaintiffs Burlap and Barrel, Inc, and Basic Fun, Inc.*

## Certificate of Service

I, Jeffrey Schwab, one of the attorneys for Plaintiffs, certify that the foregoing document was filed electronically with the Court's Case Management/ Electronic Case Filing (CM/ECF) system on March 13, 2026. The Court and/or Clerk of Court may serve and give notice to counsel by CM/ECF electronic transmission.

<div style="margin-left:50%">

Respectfully submitted

</div>

Dated: March 13, 2026

<div style="margin-left:50%">

/s/ Jeffrey M. Schwab
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org

*Counsel for Plaintiffs Burlap and Barrel, Inc, and Basic Fun, Inc.*

</div>

Plaintiffs' Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction

# Exhibit A

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Acting Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official Capacity as Secretary of the United States Department of Homeland Security*, <br><br> Defendants. | Case No.  26-01606 |

**Declaration of Ethan Frisch**

I, Ethan Frisch, state as follows:

1.  I am a United States citizen at least 18 years of age. If called to testify, I would testify as follows:

2.  I, along with Ori Zohar, am the co-founder and Co-CEO of Burlap and Barrel, Inc., ("Burlap & Barrel"), a Delaware C Corporation (Public Benefit Corporation) headquartered in New York. It employs 10 people.

3.  Burlap & Barrel is an online retailer and spice company working directly with farmers around the world to build new international supply chains that are equitable, transparent, and traceable. The company's mission is to end inequality and exploitation in the spice industry. Burlap & Barrel sells spices to home cooks and professional chefs in all 50 states via its website, www.burlapandbarrel.com.

4.  What sets Burlap & Barrel apart from other spice companies is its focus on customer accessibility through affordable pricing and quick shipping, and the quality of its spices, sourced through partnerships with innovative farmers around the world. As a public benefit corporation, Burlap & Barrel's mission is not solely to increase profits, but also to end inequality and exploitation in food systems by connecting spice farmers to U.S. consumers and establishing long-term, mutually beneficial partnerships with farmer-suppliers. By sourcing spices directly from small-scale farmers around the world, Burlap & Barrel can eliminate unnecessary intermediaries, paying farmers from two to ten times more than the commodity price for their products, and in turn offering top quality spices to American consumers at accessible prices, most retailing for under than $10.

5.  Since 2016, Burlap & Barrel has sourced unique spices and other ingredients that are grown naturally and sustainably around the world and is bringing those flavors to dinner tables across the United States. It places a significant emphasis on the quality and freshness of its spices, working carefully with specific expert farmers to grow and import the highest quality spices available.

6.   Most of the spices Burlap & Barrel carries are imported from other countries and grown under specific conditions using agricultural practices rooted in longstanding cultural norms, including cultivating rare heirloom varieties and intercropping with other local crops. They are not otherwise available in the United States, and many are not grown here at all. Most of its suppliers had never exported to the U.S. before partnering with Burlap & Barrel, which may be the only U.S. importer of certain spices, including *Cinnamomum loureiroi*, a rare Vietnamese cinnamon species, and Herbes de Provence from its native region of Provence, France, including a thyme variety granted a "Designation of Protected Origin" status by the French government and the European Union.

7.   Many spice plants can only be found or cultivated in specific climates or regions around the world. Most of the spices used in the United States cannot be grown domestically due to climate and geography.

8.   For example, one of the most widely used seasonings in the United States, garlic powder, is derived from a crop whose primary agricultural origins lie outside the Americas. Garlic is native to the foothills of the Himalayas and has been cultivated across Asia for many thousands of years prior to its arrival in the United States. Though some parts of the United States can facilitate the cultivation of garlic, the most highly prized varieties of garlic come from countries where climates, agricultural traditions, and processing infrastructure support specialty production. One such variety is the heirloom purple stripe garlic variety from Vietnam, of which (in dried powder format) Burlap & Barrel may be the sole American importer. The

same is true of many other spices that are treated as staples of American cuisine, including other alliums, such as onions and shallots, and classic herbs, such as rosemary, and thyme—all subject to the Section 122 tariffs.

9.  Burlap & Barrel imports from at least 22 countries including Afghanistan, Argentina, Barbados, Canada, Colombia, Costa Rica, Ethiopia, France, Grenada, Guatemala, Hungary, India, Indonesia, Mexico, Nepal, Nigeria, Peru, Spain, Sri Lanka, Tanzania, Turkey, and Vietnam, as demonstrated on its "Spice Sourcing Map" marketing graphic (not comprehensive):



10. Virtually every product imported by Burlap & Barrel was affected by the tariffs President Trump imposed under IEEPA starting in 2025. Although the Supreme Court has now held those IEEPA tariffs unlawful, the President's recent proclamation imposing nearly worldwide tariffs under Section 122 of the Trade Act of 1974 continues to affect Burlap & Barrel.

11. Some of the spices that Burlap & Barrel imports that are not grown domestically—including cinnamon, black peppercorns, and vanilla—are exempt from the Section 122 tariffs under Annex II of the President's Proclamation. However, Section 122 tariffs do apply to other spices it imports that have a domestic industry in the United States. While certain spices Burlap & Barrel sells are produced domestically—including salt from New York, chilies grown in California, and maple sugar produced in Vermont—Burlap & Barrel must import unique international varieties that cannot be grown in the United States, such as purple stripe garlic from Vietnam, black garlic from Guatemala, flowering hyssop thyme from Turkey, and unique herbs from Provence, France. Because these specific varieties are unavailable domestically, Burlap & Barrel cannot avoid these tariffs by switching to U.S.-grown alternatives. And as a direct-to-consumer e-commerce business, Burlap & Barrel's customers seek out specific internationally sourced spices, which are popular among the company's longtime customers.

12. Since the imposition of the 2025 tariffs, unlike many other businesses who have passed that cost on to consumers, Burlap & Barrel has refrained from passing on that cost to its customers, covering the costs itself. But the Section 122 tariffs, by

driving up costs, will force Burlap & Barrel to reduce investment in the United States by scaling back hiring, shipping, and the production of corrugated packaging.

13. These tariffs have forced Burlap & Barrel to pause spending on innovation, halting new product development, new partnerships with restaurants and celebrity chefs, and special projects like a much-requested spice advent calendar. The company is also weighing price increases on staple spices to more than $10 per unit—a move that would violate its longstanding commitment to keeping necessary grocery ingredients accessible at a cost of only pennies per serving.

14. Burlap & Barrel has already had to pay hundreds of thousands of dollars in additional costs towards the 2025 IEEPA tariffs and will continue to pay at least tens of thousands of dollars in tariffs under the President's tariffs imposed under Section 122.

15. Burlap & Barrel currently has three shipments scheduled to arrive in the next few weeks on which it will have to pay Section 122 tariffs. These imports are valued at $172,732. The expected tariff for these imports is $17,273.

16. Burlap & Barrel will pay these tariffs upon the shipment's arrival at the Port of New York and New Jersey, as well as the Port of Baltimore, Maryland.

17. Over the 150 days the Section 122 tariffs are in effect, we estimate that we will pay $60,000 in Section 122 tariffs.

18. The impact of Section 122 tariffs on our business goes beyond the direct tariff costs. Burlap & Barrel's business has already been affected by lost profits, higher shipping costs, cash flow issues, inventory fluctuations due to supply chain

uncertainty, and lost customers, partners, and contracts due to inventory shortages. Burlap & Barrel has also experienced a lack of confidence in the health of the U.S. market from international suppliers and partners. These impacts will continue while the Section 122 tariffs are in effect.

Under penalty of perjury, I affirm that the foregoing is true and correct.

2026-03-09

Plaintiffs' Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction

# Exhibit B

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| Burlap and Barrel, Inc.; Basic Fun, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Donald J. Trump, *in his official capacity as President of the United States*; Executive Office of the President; the United States of America; United States Customs and Border Protection; Rodney S. Scott, *in his official capacity as Acting Commissioner of United States Customs and Border Protection*; Jamieson Greer, *in his official capacity as United States Trade Representative*; Office of the United States Trade Representative; Department of Homeland Security; Kristi Noem, *in her official capacity as Secretary of the United States Department of Homeland Security*, <br><br> Defendants. | Case No.  26-01606 |

**Declaration of Jay Foreman**

I, Jay Foreman, have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

1.      I am a United States citizen at least 18 years of age.

2.      I am the Chief Executive Officer of Basic Fun, Inc.

3.     Basic Fun, Inc. ("Basic Fun!") is a toy company headquartered in Boca Raton, Florida. The company employs approximately 105 people in the United States.

4.     I have worked in the toy industry for decades and began my career working in a toy manufacturing facility in Brooklyn, New York, where toys were cut, sewn, assembled, packaged, and shipped domestically. Over the course of my career, I have worked with and visited numerous toy manufacturing facilities in the United States and abroad.

5.     Basic Fun! designs, markets, and sells toys and games, including classic brands such as Tonka®, Care Bears®, Lincoln Logs®, Lite-Brite®, and other well-known children's products sold to American consumers through major retailers such as Walmart, Target, and Amazon.

6.     Basic Fun! imports components and finished toy products from China. These imported products and components are necessary for Basic Fun! to manufacture and distribute its toys to retailers and consumers in the United States.

7.     Basic Fun! currently has approximately 104 shipping containers of toys and toy components scheduled to arrive in the United States during the upcoming 150-day period covered by the Section 122 tariffs. The total value of these imports is approximately $6.9 million.

8.     Based on the currently announced tariff rates, Basic Fun! expects to pay approximately $690,000 in tariffs on these shipments during that period.

9.    The global toy industry relies on a highly specialized supply chain concentrated overseas. In many cases, all the components necessary to manufacture a toy—plastic parts, rubber parts, metal parts, electronic components, batteries, packaging, and assembly—are sourced from suppliers located near one another in established manufacturing hubs.

10.    Basic Fun! relies on this global supply chain to manufacture toys efficiently and safely. The suppliers, testing facilities, and manufacturing capabilities required to produce these products are not reasonably available in the United States at scale.

11.    Less than 10% of toys purchased in the United States are manufactured domestically. The United States does not currently have the supplier network, labor force, and manufacturing infrastructure necessary to support large-scale domestic production of most toys.

12.    Recreating this manufacturing infrastructure in the United States would require the development of an entire network of suppliers, facilities, and specialized labor that currently does not exist.

13.    Even where toy manufacturing facilities are being constructed in the United States, they are highly automated operations. For example, the only major toy manufacturing plant currently being built in the United States is expected to operate largely as what is known in manufacturing as a "lights-out factory"—a facility designed to run almost entirely through automated

systems with minimal human labor and only a small crew of employees overseeing operations.

14.    As a result, tariffs on imported toys do not realistically lead to the creation of large numbers of manufacturing jobs in the United States.

15.    Basic Fun! must pay the applicable tariffs at the time its goods enter the United States through U.S. Customs and Border Protection ("CBP"). These duties are paid through the customs entry process and must be satisfied for our goods to be released into the United States.

16.    Because Basic Fun! sells products to large retailers with substantial bargaining power, the company is often unable to immediately raise prices to offset tariff costs. As a result, the tariffs significantly reduce the company's profit margins.

17.    In some instances, Basic Fun! must continue fulfilling retailer orders even when tariffs eliminate or nearly eliminate the company's profit on those sales to maintain its position with major retailers and keep its products on store shelves.

18.    The uncertainty surrounding tariff policy makes it extremely difficult for Basic Fun! to plan its business operations, set pricing, forecast earnings, and negotiate contracts with retailers.

19.    Because tariffs can change suddenly and unpredictably, Basic Fun! has difficulty determining the appropriate price for products when negotiating sales with retailers months in advance.

20.    The tariffs imposed under IEEPA and continued under Section 122 have forced Basic Fun! to freeze hiring, reduce bonuses, and limit new investments in its business.

21.    Tariff uncertainty has also caused Basic Fun! to delay or cancel potential acquisitions and growth opportunities because the company cannot reliably forecast future earnings.

22.    Tariffs also affect Basic Fun!'s financing. Because the company relies on credit facilities tied to financial performance, reduced earnings caused by tariffs may place the company at risk of breaching loan covenants, which could require renegotiation of financing terms at higher cost.

23.    The imports on which Basic Fun! relies are not reasonably available from United States suppliers. If Basic Fun! had the ability to source these products domestically at a competitive price and scale, it would already be doing so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of March, 2026.

*Jay Foreman*

_____
Jay Foreman
Chief Executive Officer
Basic Fun, Inc.