IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Chief Judge Mark A. Barnett, Judge Claire R. Kelly,
Senior Judge Timothy C. Stanceu

| | |
|---|---|
| BURLAP AND BARREL, INC. and BASIC FUN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, <br><br> Defendants. | Case No. 26-01606 |

JOINT BRIEF OF *AMICI CURIAE* CATO INSTITUTE AND ILYA SOMIN

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
lsomin@gmu.edu

*Of Counsel*

Joshua A. Claybourn, Esq.
JACKSON KELLY PLLC
20 NW Third Street, Suite 700
P.O. Box 1507
Evansville, IN 47706-1507
Phone: (812) 422-9444
jclaybourn@jacksonkelly.com

*Counsel for Amici Curiae*

TABLE OF CONTENTS

**Interest of Amici Curiae** ................................................................................... 1

**I.    Introduction and Summary of Argument** ................................................... 2

**II.   Section 122 Can Only Be Invoked in Circumstances That Cannot Exist Under a Flexible Exchange Rate Regime** ...................................................... 4

**III.  The Major Questions Doctrine Requires Invalidation of the Section 122 Tariffs** ................................................................................................... 9

    A.  The Section 122 tariffs raise a major question ................................................ 9

    B.  Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" issues ...................................................................... 16

    C.  The major questions doctrine applies to delegations of authority to the President ................................................................................................. 20

**IV.   If Section 122 Grants the President the Power He Claims Here, It Would Be An Unconstitutional Delegation of Legislative Power to the Executive** ............................................................................................... 22

    A.  The Section 122 tariffs violate the nondelegation doctrine ......................... 22

    B.  Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues............................................. 26

    C.  The constitutional avoidance canon requires interpreting Section 122 to avoid a sweeping delegation of tariff authority that raises constitutional problems........................................................................................... 27

**Conclusion** ................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
  594 U.S. 758 (2021) ....................................................................................... 9, 12, 18

*Am. Inst. for Int'l Steel, Inc. v. United States,*
  376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) ...................................................... 22

*American Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) .................................................................................................. 23

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ........................................................................................... 17, 21

*FCC v. Consumers' Research,*
  145 S. Ct. 2482 (2025) ................................................................ 3, 22, 23, 24, 25

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) .................................................................................................. 9

*Georgia v. President of the United States,*
  46 F.4th 1283 (11th Cir. 2022) ............................................................................. 20

*Gibbons v. Ogden,*
  22 U.S. (9 Wheat.) 1 (1824) .................................................................................. 23

*Gundy v. United States,*
  588 U.S. 128 (2019) ................................................................................................ 26

*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.,*
  448 U.S. 607 (1980) ................................................................................................ 21

*J.W. Hampton, Jr. & Co. v. United States,*
  276 U.S. 394 (1928) .......................................................................................... 22, 27

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) ............................................................................................. 3, 28

*Kentucky v. Biden,*
  23 F.4th 585 (6th Cir. 2022) ................................................................................. 20

*Learning Res., Inc. v. Trump,*
  146 S. Ct. 628 (2026) .......................................................................................passim

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) ................................................................ 20

*Mayes v. Biden,*
    67 F.4th 921 (9th Cir. 2023) .................................................................. 20

*Merritt v. Welsh,*
    104 U.S. 694 (1882) ................................................................................ 17

*Mistretta v. United States,*
    488 U.S. 361 (1989) ........................................................................ 22, 24

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor,*
    595 U.S. 109 (2022) ........................................................................ 12, 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................ 28

*Nebraska v. Su,*
    121 F.4th 1 (9th Cir. 2024) .............................................................. 20, 21

*Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div., Dep't of Labor,*
    312 U.S. 126 (1941) ................................................................................ 23

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ................................................................................ 21

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ............................................................................. 2, 9

*V.O.S. Selections v. Trump,*
    149 F.4th 1312 (Fed. Cir. 2025) ................................................... passim

*V.O.S. Selections v. Trump,*
    772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ........................... 7, 8, 15, 22

*Wayman v. Southard,*
    23 U.S. (10 Wheat.) 1 (1825) ................................................................ 25

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ......................................................................... 13, 18

**Constitutional Provisions**

U.S. Const. art. II, § 1 ................................................................................ 21

## Statutes

Trade Act of 1974, § 122, 19 U.S.C. § 2132........................................................passim

    19 U.S.C. § 2132(a) ........................................................... 2, 4, 5, 7, 16

    19 U.S.C. § 2132(b) ..................................................................... 16

20 U.S.C. § 1098bb(a)(1) ............................................................... 18

42 U.S.C. § 264(a) ....................................................................... 18

## Other Authorities

Comm. for a Responsible Fed. Budget, How Much Will Trump's New
    10% (or 15%), Tariffs Raise?, Mar. 4, 2026,
    https://www.crfb.org/blogs/how-much-will-trumps-new-10-or-15-
    tariffs-raise ..................................................................... 10

Congressional Research Service, *Introduction to U.S. Economy: Trade
    Deficit*, June 30, 2025..................................................... 11

Daniel Desrochers et al., *Navarro: Trump Will Still Raise Tariffs To 15
    Percent*, Politico, Mar. 25, 2026 ............................................ 10

Dir. of Nat'l Intelligence, National Intelligence Estimate: Economic
    and National Security Implications of the COVID-19 Pandemic
    Through 2026, Apr. 2022,
    https://www.dni.gov/files/ODNI/documents/assessments/NIE-
    Economic_and_National_Security_Implications_of_the_COVID-
    19_Pandemic_Through_2026.pdf.............................................. 18

*The Federalist, No. 33* (Alexander Hamilton)............................................. 23

*The Federalist, No. 48* (James Madison)............................................. 19, 23

Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases
    and the Limits of Executive Authority*, 2021–22 Cato Sup. Ct. Rev.
    69 (2022) ..................................................................... 12, 15

Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction
    Moratorium*, Reason, Aug. 3, 2021,
    https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-
    against-the-cdc-eviction-moratorium/ ........................................ 12

Ilya Somin, *How the Supreme Court Spared America*, Atlantic, Feb. 21, 2026, https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093 ................................................................. 19

Jack Goldsmith, *Maximum Executive Power and the Fate of the Unitary Executive*, Exec. Functions, Jan. 28, 2025, https://executivefunctions.substack.com/p/maximum-executive-power-and-the-fate ............................................................... 21

Jack Goldsmith & Curtis Bradley, Foreign Affairs, *Nondelegation, and the Major Questions Doctrine*, 172 U. Penn L. Rev. 1743 (2024) ......................... 27

Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967) .................................................... 5

Phillip W. Magness & Marc Wheat, *No, Mr. President, Section 122 Tariffs Won't Work Either*, Nat'l Rev., Mar. 2, 2026 ................................................ 6

Proclamation No. 11012, Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems, 91 Fed. Reg. 9339 (Feb. 25, 2026) ...................................................... 6

Scott Lincicome & Nathan Miller, *The White House Still Can't Grasp That Americans Pay US Tariffs*, Cato Inst., Feb. 19, 2026, https://www.cato.org/blog/white-house-still-cant-grasp-americans-pay-us-tariffs .................................................................. 19

Stan Veuger & Clark Packard, *Trump's New Tariffs Are Also Illegal*, Foreign Policy, Feb. 26, 2026 ...................................................... 6

2 Margaret Garritsen De Vries, The International Monetary Fund, *1972-78: Cooperation on Trial* ch. 37 (1996) .......................................... 6

Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021) ....................................................................... 25

Yale Budget Lab, *State of Tariffs*, Feb. 21, 2026, https://budgetlab.yale.edu/research/state-tariffs-february-21-2026 ........ 10, 12, 13

Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War, Tax Foundation*, Mar. 13, 2026, https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war ......................................................................... 10

## INTEREST OF AMICI CURIAE

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Suprsgnificaneme Court Review*, and files amicus briefs in state and federal courts. This case interests Cato because of its significance to the constitutional separation of powers, and its potential impact on free trade and the US economy.

Ilya Somin is Professor of Law at the Antonin Scalia Law School at George Mason University, B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute, and the author of numerous works on constitutional law and related issues, including *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed., 2022), *Democracy and Political Ignorance: Why Smaller Government is Smarter* (2d ed. 2016), and *The Grasping Hand: Kelo v. City of New London and the Limits of Eminent Domain* (rev. ed. 2016). His briefs and writings have been cited in decisions by the United States Supreme Court, lower federal courts, state supreme courts, and the Supreme Court of Israel. His writings helped inspire *V.O.S. Selections v. Trump*, the case which led to the invalidation of the IEEPA tariffs, and he served as co-counsel for the plaintiffs in that case throughout the litigation in the Court of International Trade, the Federal Circuit, and the Supreme Court.

1

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Since the invalidation of the massive International Emergency Economic Powers Act (IEEPA) tariffs, by the Supreme Court in *Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026),  the President has sought to effect a similar usurpation of congressional tariff authority by using Section 122 of the Trade Act of 1974 to impose 10 percent tariffs (likely to be increased to 15 percent) on imports from almost all our trading partners. This sweeping imposition is just as illegal as the previous one was, and for many of the same reasons.

Part I briefly explains why Section 122 simply cannot be used in current circumstances. The statute only permits tariffs for up to 150 days in response to "fundamental international payments problems" that cause "large and serious United States balance-of-payments deficits" or "an imminent and significant depreciation of the dollar," or are needed to cooperate with other countries in addressing an "international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a). These conditions simply cannot exist in a flexible exchange rate regime of the sort in place today.

In Part II, amici explain why, if there is any ambiguity about whether Section 122 authorizes the massive tariffs imposed by the administration, the major questions doctrine (MQD) requires this issue to be resolved against the Defendants. The major questions doctrine requires Congress to "speak clearly" when it assigns to the executive "decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). The impact of the massive new Section 122

2

tariffs is as large or larger than many previous policies invalidated by the Supreme Court on major questions doctrine grounds. And the tariff power is not exempt from major questions scrutiny on the supposed ground that it is a "foreign affairs" power. The major questions doctrine also counts against giving the administration a blank check in determining whether the preconditions to invoke Section 122 exist.

Part III shows that, if Section 122 did grant the President the power he claims, it would violate the nondelegation doctrine, which constrains transfer of legislative power to the executive. "[T]he core Congressional power to impose taxes such as tariffs is vested exclusively in the legislative branch by the Constitution." *V.O.S. Selections v. Trump*, 149 F.4th 1312, 1332 (Fed. Cir. 2025), *aff'd sub nom. Learning Res.,* 146 S. Ct. 628 (2026). If the Defendants' interpretation of Section 122 is correct, the President could claim there is a balance-of-payments crisis at virtually any time and repeatedly impose 15% tariffs against virtually any imports from any country, circumventing the 150-day time restriction simply by declaring a new balance-of-payments problem exists when earlier tariffs expire. Such a sweeping delegation of a core congressional power would violate the requirements that Congress cannot make "boundless" delegations of the power to tax, and that "[t]he 'guidance' needed is greater when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2497, 2501 (2025) (quotation omitted). At the very least, the constitutional issues raised by this sweeping claimed delegation are sufficient to trigger the constitutional

3

avoidance canon, which requires courts to "shun an interpretation that raises serious constitutional doubts ." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

## II.    SECTION 122 CAN ONLY BE INVOKED IN CIRCUMSTANCES THAT CANNOT EXIST UNDER A FLEXIBLE EXCHANGE RATE REGIME.

Section 122 can only be invoked in a situation where there are "fundamental international payments problems" that cause "large and serious United States balance-of-payments deficits" or "an imminent and significant depreciation of the dollar," or create a situation where tariffs are needed to cooperate with other countries in addressing an "international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a). Thus, invocation of Section 122 requires the presence of "fundamental international payments problems" and the existence of one of three additional situations caused by those problems. These circumstances do not and cannot exist today.

"Fundamental international payment problems" and balance of payments deficits can only arise in a fixed exchange-rate system, like the one the United States had when the federal government took part in the Bretton Woods system of fixed exchange rates backed by US gold reserves. In that situation, the United States could experience a shortage of currency reserves when demand for dollars at the fixed rate increased, or a shortage of gold reserves could arise when there was high demand to exchange dollars for gold. Since the end of the gold-exchange system in 1971 and the introduction of floating exchange rates in 1973, these problems have been eliminated. The US government is no longer committed to exchanging dollars for gold, and any

4

increased demand for dollars will simply lead to an equilibrating adjustment in the exchange rate. As Nobel Prize-winning monetary economist Milton Friedman explained in 1967, "a system of floating exchange rates completely eliminates the balance-of-payments problem. The [currency] price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis." Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967).

Even if some sort of balance of payments issues can still arise in the present situation, the statutory text is limited to "*fundamental* international payments problems" that cause "*large and serious* United States balance-of-payments deficits." 19 U.S.C. § 2132(a) (emphasis added). Balance-of-payments problems on such a large scale surely cannot occur in the absence of a fixed exchange rate mechanism. An "imminent and significant depreciation of the dollar" can potentially still occur. *Id*. But the statute does not allow the use of tariffs to address any and all significant depreciations, but only those caused by "fundamental international payments problems." *Id*. The latter only occur in fixed exchange rate regimes. The same point applies to the potential use of tariffs to cooperate with other countries in addressing an "international balance-of-payments disequilibrium." *Id*. In any event, the President has not invoked the dollar depreciation and international cooperation rationales in this case.

When Section 122 was drafted in 1973-74 and signed into law in 1975, it was not yet clear whether the new flexible exchange rate system would persist. President Richard Nixon and many in Congress expected that a fixed exchange regime might

5

be restored, and it is for this reason that Section 122 was enacted. See Phillip W. Magness & Marc Wheat, *No, Mr. President, Section 122 Tariffs Won't Work Either*, Nat'l Rev., Mar. 2, 2026, https://www.nationalreview.com/2026/03/no-mr-president-section-122-tariffs-wont-work-either/ (recounting this history); Stan Veuger & Clark Packard, *Trump's New Tariffs Are Also Illegal*, Foreign Policy, Feb. 26, 2026, https://foreignpolicy.com/2026/02/26/trump-tariffs-supreme-court-section-122-ilegal/ (same). Negotiations on the potential restoration of fixed exchange rates – at least in some form – continued until the 1976 Jamaica Agreement. See 2 Margaret Garritsen De Vries, *The International Monetary Fund, 1972–78: Cooperation on Trial* ch. 37 (1996) (providing overview of this history).

The President's Proclamation invoking Section 122 claims he is authorized to do so because "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country." Proclamation No. 11012, Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems, (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026), https://www.whitehouse.gov/presidential-actions/2026/02/imposing-a-temporary-import-surcharge-to-address-fundamental-international-payments-problems/.  But trade deficits and net outflows of "transfer payments" are not the same thing as fundamental balance of payments problems, nor do they amount to balance of payments deficits. Thus, they cannot be the basis for invoking Section 122. In the IEEPA litigation, Defendants themselves emphasized that trade deficits "are

6

conceptually distinct from balance-of-payments deficits," and thus that Section 122 has no "obvious application" to the authority the President sought to invoke under IEEPA. Appellant's Reply Br. at 13-14, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

This court's decision in the *V.O.S. Selections* case does not require a ruling to the contrary. There, the court noted that "[t]he President's imposition of the Worldwide and Retaliatory Tariffs responds to an imbalance in trade—a type of balance-of-payments deficit—and thus falls under the narrower, non-emergency authorities in Section 122." *V.O.S. Selections v. Trump*, 772 F. Supp.3d 1350, 1376 (Ct. Int'l Trade 2025), aff'd 149 F.4th 1312 (Fed. Cir. 2025), aff'd *Learning Res. v. Trump*, 146 S. Ct. 628 (2026). But the Court did not hold that Section 122 grants the president an unlimited power to impose up to 15% tariffs in response to any trade deficit whatsoever. He can only do so when trade deficits arise in the context of "fundamental international payments problems" that cause "large and serious United States balance-of-payments deficits" 19 U.S.C. § 2132(a). In a fixed exchange rate regime, a trade deficit might exacerbate the balance of payments deficit by further reducing the stock of dollar currency reserves available in the United States. While the government could potentially "fix" the problem by printing more dollars, that could seriously exacerbate inflation. But no such problem can arise in a flexible exchange rate regime. Thus, while, as the Court noted, Section 122 can potentially be used to address trade deficits in some situations, those circumstances cannot and do not exist at present.

In addition, the Court's statement that Section 122 can be used to address trade deficits was not essential to its holding, but rather dictum. The Court indicated that the major questions and nondelegation doctrines precluded any decision in favor of the administration's interpretation of IEEPA, and held that "[r]egardless of whether the court views the President's actions through the nondelegation doctrine, through the major questions doctrine, or simply with separation of powers in mind, any interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional." *V.O.S. Selections*, 772 F. Supp.3d at 1372. This conclusion holds true regardless of the extent to which Section 122 might authorize the use of tariffs to counter trade deficits. Significantly, neither the Federal Circuit nor the Supreme Court relied on Section 122 in upholding this Court's ruling. See *V.O.S. Selections v. Trump*, 149 F.4th at 1332-34 (basing holding on the major questions doctrine); *Learning Res. v. Trump*, 146 S. Ct. 628, 637-38 (2026) (holding that IEEPA does not authorize tariffs at all).

These issues relating to the focus of Section 122 have been outlined in greater detail in the Plaintiffs' brief, and in an amicus brief filed by Advancing American Freedom, multiple economists, and others.   Plaintiffs' Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction at 16-24; Amicus Br. of Advancing American Freedom, Inc., et al., at 11-18. Here, we emphasize only that – at the very least – there is grave doubt about whether Section 122 authorizes the imposition of sweeping tariffs under present circumstances.

## III.   THE MAJOR QUESTIONS DOCTRINE REQUIRES INVALIDATION OF THESE SECTION 122 TARIFFS.

The major questions doctrine requires Congress to "speak clearly" when it assigns to the executive "decisions of vast 'economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (the Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000) (holding that Congress cannot be assumed to have implicitly delegated the power to regulate "a significant portion of the American economy" because "Congress could not have intended to delegate a decision of such economic and political significance" without explicitly saying so).

As the Federal Circuit held in *V.O.S. Selections*, the major questions doctrine applies to delegations of tariff authority, and "when Congress delegates this power in the first instance, it does so clearly and unambiguously." *V.O.S. Selections*, 149 F.4th at 1332. Thus, it ruled that "[t]he Government's interpretation of IEEPA as providing the President power to impose unlimited tariffs… runs afoul of the major questions doctrine." *Id*. at 1334.  This conclusion was reinforced by the fact that "tariffs are a core Congressional power." *Id*. at 1335. The Federal Circuit's holding is, of course, binding precedent for this Court.

## A.    The Section 122 tariffs raise a major question.

For reasons already described, Congress, at the very least, did not clearly indicate that Section 122 can be used to impose tariffs outside the context of balance-of-payments problems that can only arise under a fixed exchange regime. See Part I,

9

*supra.* Thus, given the magnitude of the authority claimed by the President, the major questions doctrine necessarily applies.

The Section 122 tariffs are comparable in magnitude to actions declared to be major questions in past Supreme Court decisions. The Tax Foundation estimates they will impose some $27 billion in new taxes on Americans in 2026; $35 billion if the rate is raised to 15%, as administration officials claim it will be.[1] Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War*, Tax Foundation, Mar. 13, 2026, https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war. Other estimates of the tariffs' impact are even higher. See, e.g., Comm. for a Responsible Fed. Budget, *How Much Will Trump's New 10% (or 15%) Tariffs Raise?*, Mar. 4, 2026, https://www.crfb.org/blogs/how-much-will-trumps-new-10-or-15-tariffs-raise (estimating that a 10% rate would raise $35 billion over 150 days, and a 15% rate would raise $50 billion). And these estimates do not include costs imposed on consumers, investors, and others. All told, with the exception of the IEEPA tariffs recently invalidated by the Supreme Court, this amounts to the highest average US tariff schedule since 1936, when the notorious Smoot-Hawley tariffs that gravely exacerbated the Great Depression were in effect. See Yale Budget Lab, *State of Tariffs*, Feb. 21, 2026, https://budgetlab.yale.edu/research/state-tariffs-february-21-2026.

---

[1] See, e.g., Daniel Desrochers et al., *Navarro: Trump Will Still Raise Tariffs To 15 Percent*, *Politico*, Mar. 25, 2026, https://www.politico.com/news/2026/03/25/navarro-trump-tariffs-15-percent-00843828 (citing statements to this effect).

Moreover, these estimates all assume the tariffs will be terminated after 150 days. But if courts accept the Defendants' claim that Section 122 tariffs can be imposed virtually anytime there is a trade deficit and that the executive deserves sweeping deference when invoking Section 122, then the President could easily reimpose the tariffs after the initial 150-day period expires. See Defendants' Br. at 17-19 (demanding absolute deference on factual determinations); *id*. at 23-37 (claiming current account trade deficits qualify as balance-of-payments deficits). Trade deficits are ubiquitous, and the United States has had a trade deficit every year since 1976. Congressional Research Service, *Introduction to U.S. Economy: Trade Deficit,* June 30, 2025, at 1. If a trade deficit is enough to trigger Section 122, then it could be used at almost any time and the 150-day time period circumvented simply by claiming that there is a new trade deficit crisis that differs slightly from the old. More generally, if the President gets absolute deference on the issue of whether "fundamental international balance of payments problems" and balance of payments deficits exist, he could easily invoke their supposed existence at almost any time, and claim that a new set of balance of payments problems has arisen whenever the initial 150-day period expires. Thus, the true magnitude of the power claimed goes far beyond the tariff revenue that might be extracted during the initial invocation of Section 122.

Even the tariffs likely to be collected in the initial 150-day period are enough to amount to a major question on par with other policies ruled to be so by the Supreme Court. For example, the Court ruled that a temporary nationwide eviction

11

moratorium ostensibly imposed to combat the spread of Covid-19 qualified as such. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 594 U.S. 758 (2021). The National Apartment Association estimated that the moratorium imposed some $26 billion in losses on property owners. See Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium,* Reason, Aug. 3, 2021, https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-against-the-cdc-eviction-moratorium. This amount is comparable to the amount of tax increases the Section 122 tariffs are likely to impose over 150 days, and probably slightly smaller.

Similarly, the Supreme Court ruled that a major question arose as a result of nationwide Covid-19 vaccination mandate for employees of firms that employed 100 or more workers, even though the cost of getting vaccinated by that time was relatively low. See *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022); *cf.* Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases and the Limits of Executive Authority*, 2021-22 Cato Sup. Ct. Rev. 69, 75-76 (2022) (explaining that vaccination was readily available to workers, for free, by the time the mandate was imposed). Like the OSHA vaccination mandate, which affected some 84 million workers (*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. at 118-19), the Section 122 tariffs would impose costs on tens of millions of Americans, and these costs are likely to be much greater than those of getting a vaccination shot. See Yale Budget Lab, supra (estimating that 10% Section 122 tariffs would impose an average of $618 to $781 in additional expenses per household if they expire in 150 days, and more if extended beyond that time).

In *West Virginia v. EPA,* 597 U.S. 697 (2022), the Supreme Court ruled that the EPA's claim of authority to regulate greenhouse gas emissions raised a major question, even though the agency did not, at that point, have a specific regulatory plan it was implementing. This indicates that the key factor is the magnitude of the authority claimed, not just the specific details of how that authority is to be used in a particular case. What matters is that the executive laid claim to a "highly consequential power," even if it is not completely clear how much of that power it intends to use in any given instance. *Id.* at 723-24. The Defendants' position in the present case would give the President the power to use Section 122 to impose massive tariffs anytime there is a trade deficit, and perhaps anytime he claims there is a balance of payments deficit of any kind, regardless of whether one actually exists or not.

The Federal Circuit ruled that the IEEPA tariffs ran afoul of the major questions doctrine in part because they were "both 'unheralded' and 'transformative.'" *V.O.S. Selections,* 149 F.4th at 1334 (quoting *West Virginia,* 597 U.S. at 722, 724). These factors also led three Supreme Court justices to reach the same conclusion. *Learning Res.,* 146 S. Ct. at 640-41 (Roberts, C.J.) (emphasizing "transformative" impact of the authority claimed by the executive, and the fact that IEEPA had never previously been used to impose tariffs).

The Section 122 tariffs imposed by the President are similarly unheralded and transformative. Section 122 has never before been used at all, much less in a situation vastly different from the fixed exchange rate system in which it was supposed to

13

function. See Part I, *supra*. As Chief Justice Roberts noted, "[i]t is… telling that in IEEPA's half century of existence, no President has invoked the statute to impose *any* tariffs—let alone tariffs of this magnitude and scope." *Learning Res.,* 146 S. Ct. at 640 (Roberts, C.J.) (quotation omitted). Section 122 has also never been used to impose any tariffs in more than a half century of existence, much less massive tariffs affecting imports from almost all our trading partners. While Section 122, unlike IEEPA, does authorize tariffs in some circumstances, it has never before been used to impose them, because it was previously assumed that it could only be invoked in circumstances remote from those that can exist under a flexible exchange rate system. As Chief Justice Roberts emphasized in *Learning Resources*, "[w]hen Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits." *Id.* at 640. Those "strict limits" would be evaded if courts interpret Section 122 to allow imposition of massive tariffs outside the limited context of balance of payments problems that arise within a fixed exchange rate regime.

The scope of the power the President claims is undoubtedly large enough to be "transformative," since it would enable him to impose up to 15% tariffs on any imports from any nation for a 150-day period virtually anytime he wants. And, as previously noted, he would likely be able to reimpose the tariffs quickly, once the initial 150-day period expires.

The fact that Section 122, unlike IEEPA, does permit imposition of tariffs in some situations, does not vitiate the application of major questions doctrine. The key issue is not only whether some tariff authority has been granted, but the scope of that

14

authority. It matters greatly whether Section 122 only authorizes the imposition of tariffs in unusual circumstances that arise only under fixed exchange rate regimes, or whether it can be used anytime there is a trade deficit or the president claims a balance-of-payments problem has arisen. In *V.O.S. Selections*, both this Court and the Federal Circuit ruled that MQD required invalidation of the IEEPA tariffs because of the enormous magnitude of the authority claimed, even though both declined to resolve the issue of whether IEEPA might authorize tariffs in some narrower set of circumstances. *V.O.S. Selections,* 149 F.4th at 1332-34; *V.O.S. Selections v. Trump,* 772 F. Supp. 3d at 1372.

Similarly, in *NFIB v. Department of Labor*, the Supreme Court ruled that OSHA's imposition of a massive vaccination mandate affecting 84 million workers ran afoul of the major questions doctrine, even though the statute in question might well permit more narrowly tailored vaccination mandates. As the Court noted, "[w]here the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible." *NFIB*, 595 U.S. at 119; cf. Somin, *A Major Question of Power,* supra, at 82-83 (discussing this aspect of the Court's ruling). But the major questions doctrine still barred "OSHA's indiscriminate approach." *Id*.

The major questions doctrine also mandates denying the President broad deference in determining whether the preconditions for invoking Section 122 exist. The statute refers to these preconditions as objective facts existing in the world, not mere proclamations or assertions by the President. If the President can simply claim

15

that "fundamental international payments problems" that cause "large and serious United States balance-of-payments deficits" exist, and courts are required to accept his assertions without question, that creates a sweeping delegation of power that, at the very least, is not clearly stated in the statutory text.

One can argue that Section 122 is exempt from MQD scrutiny because it is phrased as a mandatory command rather than a discretionary grant of power. Section 122(a) states that the president "shall proclaim" imposition of tariffs when the triggering conditions of the statute occur. 19 U.S.C. § 2132(a). However, the statute does not specify how high the tariffs must be, except by capping the rate at 15%. *Id.* Thus, under the administration's interpretation of the law, the President would have sweeping discretion to impose tariffs anywhere between a negligible amount (e.g., 0.00001%) and 15%.   Moreover, Section 122(b) enables the president to forego imposition of any tariffs so long as he "determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States," informs Congress, and consults with a group of congressional advisers. *Id.* § 2132(b).

**B.    Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" issues.**

Defendants cannot evade application of the major questions doctrine by claiming that tariffs are matters of foreign affairs. See Def. Br. at 46-47 (making this claim). There is no general foreign affairs exception to the major questions doctrine. Even if there were, tariffs are not purely a foreign affairs issue, because – first and foremost - they are taxes imposed on Americans.

As already noted, the Federal Circuit has ruled that the major questions doctrine does apply to tariffs, and that holding is binding precedent for this Court. *V.O.S. Selections*, 149 F.4th at 1332-34. In *Learning Resources*, three of the justices in the majority also specifically held that major questions doctrine applies to tariffs, and that there is no "foreign affairs" exception to the doctrine when it comes to the tariff power. *Learning Res.*, 146 S. Ct. at 642. Chief Justice Roberts noted that "the President and Congress *do not* 'enjoy concurrent constitutional authority' to impose tariffs during peacetime" and emphasized that "[t]he Framers gave that power to 'Congress alone'—notwithstanding the obvious foreign affairs implications of tariffs." *Id.* (quoting *Merritt v. Welsh*, 104 U.S. 694, 700 (1882)).

In previous cases, the Supreme Court repeatedly applied the major questions doctrine to policies that have significant foreign affairs implications. In *Biden v. Nebraska*, 600 U.S. 477 (2023), it invalidated a claim of authority to forgive student loans based on a national emergency declaration,  even though the supposed authority in question was based on the 2003 HEROES Act, legislation meant in large part to address war and foreign policy emergencies. See *id.* at 494 (noting that "[t]he HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency.' 20 U.S.C. § 1098bb(a)(1)").

In *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, the Court applied MQD to invalidate a nationwide eviction moratorium intended to curb the spread of

17

COVID-19, even though the statute authorized measures to curb the "spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 594 U.S. at 761 (quoting 42 U.S.C. § 264(a)). The possibility that the eviction moratorium could inhibit the spread of COVID-19 "from foreign countries" did not prevent application of MQD. Moreover, the widespread death and economic disruption inflicted by the COVID-19 emergency quite obviously impacted U.S. foreign policy and national security. See Dir. of National Intelligence, *National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026*, Apr. 2022, https://www.dni.gov/files/ODNI/documents/assessments/NIE-Economic_and_National_Securtiy_Implications_of_the_COVID-19_Pandemic_Through_2026.pdf (outlining major foreign policy implications in detail). That did not prevent the Supreme Court from applying MQD to policies intended to mitigate the pandemic. Similarly, in *West Virginia v. EPA*, the Supreme Court ruled that an assertion of power to impose environmental regulations intended to combat climate change qualifies as a major question, even though climate change is a major international problem, with obvious foreign affairs implications. *West Virginia*, 597 U.S. at 723-32.

In addition, tariffs are obviously not purely or even primarily matters of foreign affairs. They are, in fact, taxes imposed on Americans. Studies consistently find that 90% or more of the cost imposed by the IEEPA tariffs mandated by the President was paid by American businesses and consumers. See Ilya Somin, *How the Supreme Court*

18

*Spared        America,*        Atlantic,        Feb.        21,        2026, https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093/ (citing multiple studies on this point); Scott Lincicome & Nathan Miller, *The White House Still Can't Grasp That Americans Pay US Tariffs,* Cato Inst., Feb. 19, 2026, https://www.cato.org/blog/white-house-still-cant-grasp-americans-pay-us-tariffs (same). There is no reason to expect the Section 122 tariffs to be any different.

"Recognizing the taxing power's unique importance, and having just fought a revolution motivated in large part by 'taxation without representation,' the Framers gave Congress 'alone . . . access to the pockets of the people.'" *Learning Res.,* 146 S. Ct. at 638 (quoting *Federalist* No. 48 (James Madison). For these reasons, among others, the tariff power cannot be considered a pure "foreign affairs" authority exempt from the major questions doctrine.

## IV.    C. IF SECTION 122 GRANTS THE PRESIDENT THE POWER HE CLAIMS HERE, IT WOULD BE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE.

If this Court were to conclude that Section 122 grants the President the power to impose the tariffs at issue in this case, it would have to invalidate the statute under the nondelegation doctrine. The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government. *Mistretta v. United States*, 488 U.S. 361, 371 (1989). "Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that the legislative power over trade cannot be abdicated or transferred to the Executive." *Am. Inst. for Int'l Steel, Inc. v. United*

19

*States*, 376 F. Supp. 3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante). In *V.O.S. Selections*, this Court rightly applied the nondelegation doctrine to tariffs, emphasizing that "[t]he separation of powers is always relevant to delegations of power between the branches." 772 F. Supp. 3d at 1371-72. That basic principle applies here, as well.

## A.     The Section 122 tariffs violate the nondelegation doctrine.

The Supreme Court has long held that the nondelegation doctrine requires Congress to provide an "intelligible principle" to constraint executive discretion. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "[I]n examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Consumers' Research*, 145 S. Ct. at 2497 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).  In addition, Congress must "provide[] sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Id.* (quoting *Opp Cotton Mills, Inc. v. Adm'r of Wage and Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)).

It is especially important to constrain delegations of tariff authority. "The power to impose tariffs is 'very clear[ly] . . . a branch of the taxing power'" and the Framers of the Constitution "[r]ecogniz[ed] the taxing power's unique importance, having just fought a revolution motivated in large part by 'taxation without representation.'" *Learning Res.*, 146 S. Ct. at 639 (Roberts, C.J.) (quoting *Gibbons v.*

20

*Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824)). The Framers therefore ensured that only the legislature would have "access to the pockets of the people." FEDERALIST No. 48 (James Madison). As the Supreme Court emphasized in *Learning Res.* (*Id.* at 637-38), Alexander Hamilton wrote in the Federalist Papers that the power to tax was "the most important of the authorities proposed to be conferred upon the Union." *Federalist* No. 33 (Alexander Hamilton).

Just last year, in *FCC v. Consumers' Research*, the Supreme Court held that a delegation of authority to impose taxes or fees must have a "floor" and a "ceiling" and that the degree of "guidance" required from Congress is greater "when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *Id.* at 2497, 2501-02 (quotation omitted). The power to impose 15 percent tariffs on imports from all our trading partners is unquestionably one that massively affects the "entire national economy." And the Defendants' permissive interpretation of the law would allow the President to impose those rates at almost any time. See § II.A, supra. While the issues of what qualifies as a "fundamental international payments problem" or a "large and serious United States balance-of-payments deficit" may seem technical in nature, in this statute they have sweeping implications for the entire national economy, and thus cannot simply be delegated to unconstrained executive discretion.

Section 122 does limit tariff rates to 15 percent, creating a ceiling. 19 U.S.C. § 2132(a). But in *Consumers' Research*, the Supreme Court emphasized that even a fixed numerical ceiling is not constraining enough if it leaves the executive with what

21

amounts to "boundless power." As the Court noted, a hard $5 trillion limit on the amount of "contributions" the FCC could levy would not be sufficient, because "[t]he purpose of the nondelegation doctrine is to enforce limits on the 'degree of policy judgment that can be left to those executing or applying the law" and "[t]he anywhere-up-to-$5-trillion tax statute would not do that." *Consumers' Research*, 145 S. Ct. at 2501 (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)). Such a permissive limit would violate nondelegation constraints because it "effectively leaves [the] agency with boundless power." *Id.* Here, if the President can use Section 122 to impose 15% tariffs any time there is a trade deficit or he otherwise claims there is a balance of payments problem, he would indeed be able to wield almost boundless tariff authority – enough to impose trillions of dollars in taxes on Americans; and there would be no effective limit on the "degree of policy judgment" he gets to exercise. *Id.*

The sweeping power claimed by the Defendants violates virtually any plausible theory of the nondelegation doctrine. In a well-known 1825 decision, Chief Justice Marshall indicated that Congress cannot delegate power over "important subjects." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825); see also Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021) (defending this approach to nondelegation). Although "the line has not been exactly drawn which separates those important subjects which must be entirely regulated by the legislature itself from those of less interest," it is undeniably true that the power to impose sweeping tariffs of up to 15% on products from every nation in the world qualifies as an

22

"important subject." *Wayman*, 23 U.S. (10 Wheat.)  at 43. And, as noted earlier, Defendants' interpretation of the statute would give the President nearly unlimited discretion to impose any tariff rate between a negligible amount and 15% at almost any time. See § II.A, *supra*.

As already noted, modern precedent requires there to be an "intelligible principle," but also emphasizes that delegations of the taxing power must have clear, stringent limits, especially in cases where the policy in question will affect the "entire national economy." *Consumers' Research*, 145 S. Ct. at 2497. That requirement is violated by Defendants' interpretation of Section 122.

Justice Gorsuch has argued that nondelegation requires Congress to "make…the policy decisions when regulating private conduct," while authorizing the executive to "fill up the details" and engage in appropriate fact-finding.  *Gundy v. United States*, 588 U.S. 128, 157-59 (2019) (Gorsuch, J., concurring).Sweeping authority to impose up to 15% tariffs on imports from any nation at almost any time clearly is a delegation of power over "private conduct" that goes far beyond merely filling in details or engaging in fact-finding.

**B.     Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues.**

Just as claimed delegations of tariff authority are not exempt from the major questions doctrine on the grounds that they are "foreign affairs" issues, so they are not exempt from normal constitutional constraints on delegation on that basis, despite Defendants' claims to the contrary. Def. Br. at 49. Many of the reasons why

23

tariffs are not exempt from MQD also apply to nondelegation. See §II.B, *supra*. Most notably, tariffs are not purely exercises of powers related to foreign affairs, but are impositions of taxes on Americans. While they also have an impact on foreign nations, the same thing is true of policies enacted through the use of many other congressional powers. As Justice Gorsuch noted in his concurring opinion in *Learning Resources*, such powers "include not only the power to impose tariffs,.. but also the power to establish uniform rules of naturalization, . . . appropriate money for armies, . . ., and define and punish offenses against the law of nations." *Learning Res.*, 146 S. Ct. at 664 (Gorsuch, J., concurring). If powers that touch on foreign affairs are largely exempt from nondelegation constraints, "all these legislative powers and more could be passed wholesale to the executive branch in a few loose statutory terms, no matter what domestic ramifications might follow." *Id.*

Furthermore, tariffs are part of the "core congressional power of the purse," over which the president has no inherent authority of his own. *Learning Res.*, 146 S. Ct. at 639 (Roberts, C.J.). This differentiates tariff delegations from delegations of authority in areas where the president does have his own inherent powers. See *Learning Res.*, 146 S. Ct. at 663-64 (Gorsuch, J., concurring) (emphasizing this distinction); *V.O.S. Selections*, 149 F.4th at 1346 (Cunningham, J., concurring) (distinguishing tariffs from the "traditionally executive embargo authority" on this basis); Cf. Jack Goldsmith & Curtis Bradley, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Penn L. Rev. 1743, 1788–89 (2024) (explaining that "the President has no independent constitutional authority over international

24

commerce" and therefore "a simple categorical determination that an area involves foreign affairs or national security cannot by itself suffice to address delegation concerns" when it comes to statutes related to foreign trade). In addition, "the idea that tariff delegations are subject to a lower non-delegation standard is incompatible with [the Supreme Court's ruling in] *J.W. Hampton*, which addressed a tariff statute while creating the intelligible principle standard." *V.O.S. Selections*, 149 F.4th at 1346 (Cunningham, J., concurring) (citing *J.W. Hampton*, 276 U.S. at 409).

### C. The constitutional avoidance canon requires interpreting Section 122 to avoid a sweeping delegation of tariff authority that raises constitutional problems.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). "The question is not whether" an interpretation that avoids constitutional problems "is the most natural statutory interpretation"—"only whether it is a 'fairly possible'" one. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) (citation omitted) [NFIB]. The severe nondelegation concerns raised by the government's sweeping interpretation of Section 122 are undeniably sufficient to trigger the constitutional-avoidance canon.

The Court can easily avoid constitutional problems by limiting Section 122 to those circumstances outlined in the statutory text: situations where there are balance of payment problems of a kind that can only arise in a fixed exchange rate regime.

25

See Part I, *supra*. An interpretation of Section 122 limited to those special circumstances is undeniably at least "fairly possible." *NFIB*, 567 U.S. at 563. That is all that is needed to trigger application of the avoidance canon.

## CONCLUSION

For the foregoing reasons, this Court should rule for Plaintiffs.


Respectfully submitted,

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
lsomin@gmu.edu

*Of Counsel*

Dated: April 7, 2026

Joshua A. Claybourn
JACKSON KELLY PLLC
20 NW Third Street, Suite 700
P.O. Box 1507
Evansville, IN 47706-1507
Phone: (812) 422-9444
jclaybourn@jacksonkelly.com


*Counsel Amici Curiae*

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Chief Judge Mark A. Barnett, Judge Claire R. Kelly,
Senior Judge Timothy C. Stanceu

| | |
|---|---|
| BURLAP AND BARREL, INC. and BASIC FUN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; OFFICE OF UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, <br><br> Defendants. | Case No. 26-01606 |

**Certificate of Compliance**

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel, certifies this brief complies with the Court's type-volume limitation rules. This brief contains no more than 7,000 words. This brief also complies with all typeface and margin requirements.

Respectfully submitted,

*/s/ Joshua A. Claybourn*
Joshua A. Claybourn
*Attorney to Amici Curiae*

1