IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

Before Honorable Mark A. Burnett, Chief Judge, Honorable Claire
R. Kelly, Judge, and Honorable Timothy C. Stanceu, Judge

| | |
|---|---|
| BURLAP AND BARREL, INC.; BASIC FUN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*; et al., <br><br> Defendants. | Case No. 26-cv-01606 |

**Plaintiffs' Reply Brief in Support of Their Motion for
Preliminary Injunction and/or Summary Judgment for
Permanent Injunction**

# Table of Contents

Table of Authorities ................................................................................................... ii

Summary of the Argument...........................................................................................1

Argument .....................................................................................................................1

    I.     There is no fundamental international payments problem requiring import restrictions and no large and serious balance-of-payments deficit. ......................................................................................................1

         A.  A deficit in one component of the balance of payments is not a "balance-of-payments deficit.". ......................................................2

         B.  Section 122's narrow scope is a feature of its design, and the President may not expand that scope to address problems it was not intended to solve. ..........................................................................6

         C.  Section 122 requires both a balance-of-payments deficit and a fundamental international payments problem. .......................................9

         D.  Defendants' reliance on *V.O.S. Selections* is misplaced and contradicts their own prior position. ......................................................13

    II.    The Court must independently determine whether the President's Proclamation satisfies Section 122's limits. ................................................15

         A.  The President's compliance with Section 122 presents a reviewable legal question ............................................................................15

         B.  Courts do not defer to the President's interpretation of statutory limits on delegated authority .............................................................17

         C.  This Court has already rejected the argument that similar statutory standards are unreviewable .................................................18

    III.   The major questions doctrine applies to economic regulations touching on foreign affairs.............................................................................19

         A.  There is no "foreign affairs" exception to the major questions doctrine ......................................................................................19

         B.  Learning Resources reinforces that broad delegations are not blank checks ............................................................................................19

         C.  Section 122 is a "clear and limited" delegation, not a fundamental revision.............................................................................20

    IV.   If Defendants' interpretation were correct, Section 122 would violate the nondelegation doctrine .......................................................................21

         A.  Defendants' reading would eliminate any intelligible principle ...........21

         B.  Defendants' interpretation renders Section 122's limits meaningless .22

C. The canon of constitutional avoidance confirms Plaintiffs' reading .....22

V.   The Proclamation's product exceptions evidence a failure to exercise independent statutory judgment ..............................................................23

    A. The exceptions show that the administration is attempting to shoehorn the unlawful IEEPA tariffs into Section 122.........................23

    B. Defendants' post-hoc rationalizations cannot cure the initial failure to follow the statute ...............................................................24

    C. The unlawful exceptions are not severable from the Proclamation......24

VI.   The injunctive relief factors favor Plaintiffs................................................25

    A. Plaintiffs will suffer irreparable harm...................................................25

    B. The balance of hardships and public interest favor an injunction........27

Conclusion.................................................................................................................28

Certificate of Compliance .......................................................................................30

Certificate of Service...............................................................................................31

iii

# Table of Authorities

**Cases**

*Am. Signature, Inc. v. United States,*
598 F.3d 816 (Fed. Cir. 2010) ..................................................................... 27

*Biden v. Nebraska,*
600 U.S. 477 (2023)............................................................................... 20, 21

*Celsis in Vitro, Inc. v. CellzDirect, Inc.,*
664 F.3d 922 (Fed. Cir. 2012) ..................................................................... 26

*Egelhoff v. Egelhoff,*
532 U. S. 141 (2001)..................................................................................... 16

*Fed. Mogul Corp. v. United States,*
63 F.3d 1572 (Fed. Cir. 1995) ..................................................................... 19

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States,*
744 F.2d 787 (Fed. Cir. 1984) ..................................................................... 15

*Gundy v. United States,*
588 U.S. 128 (2019)...................................................................................... 23

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004)...................................................................................... 28

*Heckler v. Chaney,*
470 U.S. 821 (1985)...................................................................................... 16

*HMTX Indus. LLC v. United States,*
156 F.4th 1252 (Fed. Cir. 2023).................................................................. 23

*Holloway v. United States,*
526 U.S. 1 (1999)............................................................................................ 3

*In re Section 301 Cases,*
524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021)............................................... 28

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928)...................................................................................... 21

*Kwo Lee, Inc. v. United States,*
24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014)................................................. 28

*Learning Res. v. United States,*
607 U.S. _____ (2026) ...................................................................... 13, 20, 21

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)................................................................................ 16, 18

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803)......................................................................... 2

iv

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999) .......................................................................... 25

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................... 27

*Retractable Techs., Inc. v. United States,*
    739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ............................................. 26

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ............................................................................ 24

*Toro Co. v. White Consol. Indus., Inc.,*
    266 F.3d 1367 (Fed. Cir. 2001) ........................................................... 13

*United States v. U.S. Coin & Currency,*
    401 U.S. 715 (1971) .......................................................................... 27

*Utility Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) .......................................................................... 19

*V.O.S. Selections v. United States,*
    850 Fed. App'x 789 (Fed. Cir. 2021) ..................................................... 13

*V.O.S. Selections, Inc. v. Trump,*
    772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ................................... 13, 18, 19

*W. Coast Hotel Co. v. Parrish,*
    300 U.S. 379 (1937) .......................................................................... 28

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ............................................................................ 9

*Wisconsin Cent. Ltd. v. United States,*
    585 U.S. 274 (2018) ............................................................................ 9

*Yoshida Int'l, Inc. v. United States,*
    378 F. Supp. 1155 (Cust. Ct. 1974) ......................................................... 8

**Statutes**

19 U.S.C. § 2132 ...................................................................... passim

22 U.S.C. § 286 ............................................................................... 7

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
    (2012) ................................................................................... 3, 6, 11

Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump
    Trade War*, Tax Foundation, Apr. 11, 2025 ............................................. 27

General Agreement on Tariffs and Trade, Oct. 30, 1947, 61 Stat. T.I.A.S. No. 1700,
    art. XII ........................................................................................... 7

Johannes Fritz, *The Section 122 Exemption Structure, Explained*, Glob. Trade Alert (Feb. 23, 2026) ............................................................................................ 24

Joint Economic Committee, 88th Cong., *The United States Balance of Payments— Perspectives and Policies* (1963) ............................................................... 3, 4

Lewis Carroll, *Through the Looking-Glass* (Macmillan & Co. 1871) .......................... 2

Mary Cunningham, *IMF Forecasts Slower U.S. Economic Growth in 2025, Pointing to Escalating Trade War,* CBS News (April 22, 2025) .............................. 27

Olesya Dmitracova, *The Economic Damage From Trump's Tariffs is Piling Up*, CNN, Apr. 23, 2025 ..................................................................................... 27

Paul Davidson, et al., *Is America's Economic Slip Temporary? Trump, Biden Allies Divided Over GDP Report,* USA Today (April 30, 2025) ......................... 27

Proclamation 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems,* (Feb. 20, 2026) ......................... 23

Reply Resp. for Appellants, *V.O.S. Selections, Inc. v. Trump*, Fed. Cir. No. 25-1812 ....................................................................................................................... 14

S. Rep. No. 93-1298 (1974) .......................................................................... 7, 14

Special Message to the Congress Proposing the Trade Reform Act of 1973, 1973 Pub. Papers 282 (Apr. 10, 1973) .............................................................. 7

*The Bretton Woods Agreements* (Naomi Lamoreaux & Ian Shapiro eds., 2019) ....... 11

*Trade Deficit and the Economy: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Finance*, 98th Cong. (1984) ........................................... 3, 4, 8

**Constitutional Provisions**

U.S. Const. art. I, § 8 ................................................................................... 19

## Summary of the Argument

Section 122 provides the President with narrow, time-limited authority to address specific international payments crises. The February 20, 2026 Proclamation exceeds that authority in three respects. First, a persistent trade deficit in goods is not a "balance-of-payments deficit" as the term was understood when Congress enacted the statute. Second, the Proclamation's system of country-specific and product-specific exceptions violates the statutory mandates for uniform and nondiscriminatory application. Because these exceptions are central to the Proclamation's operation, their illegality renders the entire tariff order invalid. Third, the administration's interpretation of Section 122—asserting a virtually unlimited power to address current account deficits—would raise serious nondelegation concerns. Because the Proclamation is untethered from its statutory requirements, it is unlawful and should be enjoined.

## Argument

I.    **There is no fundamental international payments problem requiring import restrictions and no large and serious balance-of-payments deficit.**

For the administration to impose its tariffs under Section 122, two separate conditions must be met: First, there must be a fundamental international payments problem. Second, there must be a large and serious balance-of-payments deficit. Defendants try to collapse these requirements into one, asserting that a balance-of-payments deficit is merely a subset of a fundamental international payments problem—and thus not an independent condition at all. They also substitute "trade

1

deficit" or "current account deficit" for the statutory term "balance-of-payments deficit"—terms that they acknowledge are simply components of the broader balance of payments. Defs.' Resp. 25–26.

In *Through the Looking-Glass*, Humpty Dumpty asserts his authority over language by declaring, "When I use a word . . . it means just what I choose it to mean—neither more nor less." Lewis Carroll, *Through the Looking-Glass* 124 (Macmillan & Co. 1871). Defendants take the same approach here, treating "balance-of-payments deficit" and "fundamental international payments problem" as if they mean whatever the administration now says they mean. But it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This Court should reject the government's attempt to rewrite these statutory terms.

The government's position conflates the way the "balance of payments" is recorded as an accounting framework with the distinct economic deficit Congress addressed, disregards the settled meaning and historical context of the specific terms Congress chose, and effectively erases the independent statutory condition of a fundamental international payments problem.

### A.    A deficit in one component of the balance of payments is not a "balance-of-payments deficit."

The parties agree that for the President to assert the power provided in Section 122 that Plaintiffs challenge in this case, there must be a "large and serious United States balance-of-payments deficit[]." 19 U.S.C. § 2132(a)(1). But Plaintiffs and Defendants diverge on what that term means and whether it exists currently.

When interpreting the language of statutes that Congress enacts, courts focus on the words that drafters have chosen, considering the meaning, its placement, and the purpose of the statutory scheme. *Holloway v. United States*, 526 U.S. 1, 6 (1999). From the outset, Defendants attempt to avoid these principles.

The term "balance-of-payments deficit" carried a specific meaning when Congress enacted the statute in 1974. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) (words in a statute must be given the meaning they had when the text was enacted). In 1974—and still today—a "balance-of-payments deficit" referred to how the nation's overall accounts were brought into balance. When private transactions—trade and private investment—did not offset one another, the remaining gap had to be settled by the government—through a reduction in U.S. monetary (gold) reserves and/or an increase in liquid liabilities. *See, e.g.,* Joint Economic Committee, 88th Cong., *U.S. Balance of Payments* 16 (1963); *Trade Deficit and the Economy: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Finance*, 98th Cong. 165 (1984) (statement of Martin Feldstein, Chairman, Council of Econ. Advisers).

The government resists this definition "balance-of-payments deficit" asserting that because it is "driven and dominated by the trade deficit," that the two terms are "empirically the same." Defs.' Resp. 26–27. Defendants confuse the meaning of this term with the accounting method used to record it. The government claims that because the balance of payments is recorded using a double-entry accounting system whose entries always net to zero, *id.* at 25, an overall "balance-of-payments

3

deficit" is impossible and Section 122 therefore must refer to a deficit in one component account, particularly the current account, *id.* at 26. But that accounting rule explains only how transactions are recorded; it does not define the economic condition Congress identified as a "deficit."

Congress used the term "balance-of-payments deficit" to describe a failure of private transactions to settle the nation's external accounts. *See* Joint Economic Committee, 88th Cong., *The United States Balance of Payments—Perspectives and Policies* 3 (1963) (statement of Gerald A. Pollack) (explaining the "official U.S. definition" in terms of "reduction in U.S. monetary reserve assets"). When private trade and private investment did not offset one another, the government had to fill the gap by drawing down its own gold and foreign currency reserves or increasing its debt to foreign central banks. *See Trade Deficit and the Economy: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Finance*, 98th Cong. 48 (1984) (statement of Martin Feldstein, Chairman, Council of Economic Advisers) (defining the "technical definition for the balance-of-payments" as the "rate of accumulation of official reserve assets, including gold"). That shortfall—the amount the government had to finance to keep the accounts in balance—was the "balance-of-payments deficit." See *id.* It reflected a genuine financial constraint on the nation's ability to meet its international payments, not merely a negative balance in one category of transactions.

Under the fixed-exchange-rate regime that framed Congress's use of this language, the value of the dollar was set by law. If private trade and investment did

4

not balance, the exchange rate could not simply adjust to bridge the gap; instead, the government had to expend its own reserves to maintain the dollar's value. A "balance-of-payments deficit" therefore signaled a risk that the United States would run out of the liquid assets needed to settle its international debts.

Although today's floating-rate system makes such a crisis significantly less likely, the nature of a "balance-of-payments deficit" remains the same. In a floating-rate world, the value of the dollar can rise or fall to help bring trade and investment back into alignment, and private capital flows usually move to finance any trade gap. A true balance-of-payments deficit arises only when private trade and investment are not enough to pay for the nation's total obligations to the rest of the world and the government must step in to settle the difference.

The government does not assert that this kind of balance-of-payments deficit exists. Instead, to justify the administration's tariffs, it asserts that a "balance-of-payments deficit" is synonymous with a trade deficit or a current account deficit. Defs.' Resp. 26–27.

But a trade deficit is merely one component of the balance of payments; it does not, on its own, constitute a "balance-of-payments deficit." A part is not the whole, no matter how large or important it is. If a corporation claimed a tax loss based on one division's deficit while other divisions made it profitable overall, that claim would be unlawful. Here, Defendants attempt the same move: redefining "balance of payments" to mean just one of its components—the current account—to justify a reach of power they do not possess.

5

But it's only when private trade and investment are not enough to pay for the current account deficit that a balance-of-payments deficit exists. Congress's choice in drafting Section 122 to use the term "balance-of-payments deficit"—rather than "trade deficit" or "current account deficit"—implies the exclusion of those latter conditions as triggers for the President's tariff authority in Section 122. See Scalia & Garner, *supra* at 107 (describing the negative-implication canon as "the expression of one thing implies the exclusion of others); *id.* at 93 (the omitted-case canon: nothing is to be added to what the text states).

In short, the government resists the meaning of "balance-of-payments deficit" understood by Congress at the time it enacted Section 122, by ignoring it and attempting to replace it with its component parts—a trade deficit or current account deficit. The government's position is contrary to the principles of statutory construction, and if adopted, it would fundamentally expand Section 122 into a permanent, rolling authority to bypass Congress and impose 15% tariffs indefinitely, not an emergency authority limited to large and serious balance-of-payments deficits.

## B.   Section 122's narrow scope is a feature of its design, and the President may not expand that scope to address problems it was not intended to solve.

The government contends that interpreting Section 122 by defining "balance-of-payments deficit" as it was commonly understood when Congress adopted it would render Section 122 "useless" or a "dead letter" upon enactment in 1974 because the Bretton Woods system had ended in 1972. Defs.' Resp. 30. This is historically and legally incorrect. While the formal gold window closed in 1971, the international

6

monetary system in 1974 remained in a state of reserve-dependent transition. President Nixon had reestablished fixed exchange rates under the Smithsonian Agreement in December 1971, which lasted until early 1973. In requesting the Trade Act's new authorities, President Nixon explicitly referenced the need to improve upon that recently collapsed framework. *See* Special Message to the Congress Proposing the Trade Reform Act of 1973, 1973 Pub. Papers 282, 287 (Apr. 10, 1973) (requesting "flexible" tools to manage payments imbalances in the wake of the 1971–1973 crises).

And U.S. obligations for balance-of-payments accounting under the IMF remained binding until the Second Amendment to the IMF Articles of Agreement took effect in 1978. *See* 22 U.S.C. § 286e-5 (authorizing U.S. acceptance of those amendments). Most significantly, GATT Article XII—under which the United States operated in 1974 and under which the current administration continues to file notices with the WTO—specifically defines a balance-of-payments deficit in terms of a serious decline in "monetary reserves." *See* General Agreement on Tariffs and Trade, Oct. 30, 1947, 61 Stat. A-3, A-31, T.I.A.S. No. 1700, art. XII(2). Congress legislated to shore up the President's authority to handle 1971-style reserve crises. Indeed, the Senate Finance Committee report noted that Section 122 was intended to provide a clear statutory basis for the type of emergency surcharge seen in 1971, which was at the time facing a pending legal challenge. *See* S. Rep. No. 93-1298, at 188 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7322–23; *see also Yoshida Int'l,*

7

*Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975).

The payments crisis—characterized by accelerating gold outflows and an unsustainable accumulation of liabilities to foreign central banks—addressed by the "Nixon Shock" of 1971 was the very emergency Section 122 was built to address. It was a crisis of official settlements, not merely a negative trade balance. When the transition to a floating-rate regime was finally complete a decade later, the specific emergency contemplated by Section 122 became functionally dormant. As Martin Feldstein testified before the Senate Finance Committee in 1984, the shift to floating exchange rates had rendered this once-vital emergency clause effectively "defunct" because the government no longer needed to "finance" a deficit through reserves. Feldstein, *supra*, at 165.

That the passage of time has made Section 122's jurisdictional trigger rare does not mean that Section 122 was useless or a dead letter. Congress may reasonably preserve authority for a return to a fixed-rate system. Statutory authorities throughout the United States Code are currently unavailable to the President because the conditions Congress laid out do not currently obtain. The government's argument carries the implicit assumption that *some* authority must be found to impose the tariffs the President seeks. But this is backwards: the President is only entitled to act where Congress empowered him to—if Congress has left a gap in his tariff authority, that simply means Congress is retaining that portion of its Article I powers for itself. Even if circumstances have changed to make Section 122 a "dead

8

letter," that still does not authorize the government to change the definition of a technical economic term to maintain a grant of power Congress chose to limit.

The government's "dead letter" argument rests on the flawed premise that a statute's meaning must evolve to stay "useful" as the world changes. But it is a fundamental principle of statutory interpretation that "the meaning of a statute is fixed at the time of enactment and does not change over time." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). If a 1920 statute gave the President power to regulate telegraph lines, he could not unilaterally update that authority to regulate the internet simply because telegraphs became obsolete. He would have to return to Congress for new authority.

The same is true here. As the Supreme Court recently reaffirmed, if a "long-extant statute" is suddenly used to claim "unheralded power" over a significant portion of the economy, the court must be skeptical of such a "transformative" expansion. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). That Section 122 might have fewer real-world applications in a floating-rate era than it did in 1974 is a feature of its narrow design, not a bug that the President is entitled to fix by redefining its core terms. A dormant emergency power is not a dead power; it is a limited one.

### C.  Section 122 requires both a balance-of-payments deficit and a fundamental international payments problem.

Section 122 establishes two distinct requirements. The President may act only when action is needed "to deal with fundamental international payments problems," and—relevant here—when those problems are associated with "large and serious

United States balance-of-payments deficits." 19 U.S.C. § 2132(a)(1).[1] The statute thus requires both a qualifying deficit and the existence of resulting payments problems.

These requirements perform different functions. A "balance-of-payments deficit" identifies a condition in the Nation's external accounts—a shortfall in private transactions requiring the government to make up the difference. "Fundamental international payments problems," by contrast, describe the economic consequence—a breakdown or strain in the Nation's ability to meet its external obligations. The former may give rise to the latter. But the statute requires that a fundamental international payment problem exist.

Defendants attempt to read out "fundamental international payments problems" as a condition of the authority to act under Section 122. They assert that "a large and serious balance-of-payments deficit is a subset of or a form of a fundamental international payments problem under Section 122." Defs.' Resp. 42. Defendants' interpretation is irreconcilable with the statutory text, ignores the historical context in which Congress enacted Section 122, and is undermined by Defendants' own accounting theory.

---

[1] Section 122 also authorizes action when it is needed to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, 19 U.S.C. § 2132(a)(2), or to cooperate with other countries in correcting an international balance-of-payments disequilibrium, 19 U.S.C. § 2132(a)(3). Defendants have not asserted either of these as a basis for the Proclamation. But any of these situations also requires fundamental international payments problems before the president can act under Section 122.

First, Defendants' reading collapses two independent statutory requirements. If Congress had intended to authorize action simply because a balance-of-payments deficit exists, there would have been no reason to include the "fundamental international payments problems" language. The surplusage canon of statutory construction provides that "every word and every provision is to be given effect," and a court must avoid an interpretation that causes a provision "to have no consequence." Scalia & Garner, *supra*, at 174. By labeling the deficit a "subset" of the problem, Defendants effectively delete that limiting language from the law. The ordinary meaning of the phrase confirms that it must do independent work: a "payments problem" refers to a difficulty in making or sustaining international payments—not simply the presence of a deficit within a component of an accounting system. The modifier "fundamental" narrows the field further, pointing to serious, systemic problems in the nation's ability to pay its international debts.

Second, the historical context confirms that Congress intended these as distinct constraints. Section 122 was enacted in the wake of a "fundamental international payments problem"—where countries started redeeming dollars for gold, depleting U.S. gold reserves, which threatened the United States' ability to meet its financial commitments. *The Bretton Woods Agreements* 132 (Naomi Lamoreaux & Ian Shapiro eds., 2019). Under the fixed-rate system of that era, that pressure was closely associated with a balance-of-payments deficit: because the dollar's value was pegged, a balance-of-payments deficit required the government settle the difference through its actual gold reserves. A sustained drain on those reserves directly

11

threatened the United States' ability to continue honoring its obligation to convert dollars into gold, potentially resulting in a systemic failure to meet its international commitments. Congress explicitly included the "fundamental international payments problems" language against that backdrop to ensure that this extraordinary authority could be used only when a balance-of-payments deficit created a genuine risk of such a payments failure. In a floating-rate system, by contrast, such pressure does not automatically arise from a trade or current-account deficit, because private capital flows and exchange-rate adjustments typically absorb the imbalance. But that only reinforces the statutory design: the existence of a deficit alone is not enough—the statute requires the additional showing of a resulting "fundamental international payments problem."

Third, Defendants' own theory underscores the mismatch. Defendants repeatedly assert that the balance of payments always nets to zero because deficits in one account are offset by surpluses elsewhere. Defs.' Resp. 25. But if that is so, then a trade or current-account deficit does not itself establish a "payments problem." It shows only that one part of the accounts is negative while another part offsets it. A country can run a trade deficit for decades while fully meeting its external obligations through capital inflows. In that situation, it is making its international payments, not failing to make them.

The government does not claim that the United States is currently having trouble meeting its international monetary obligations. Because the United States has run a trade deficit for over forty years without such a crisis, Defendants are

12

forced to try to read the "payments problem" requirement out of the statute entirely. But Section 122 does not authorize tariffs simply because a deficit exists; it authorizes a temporary, emergency response to a specific kind of systemic payments crisis. Defendants have shown a routine trade imbalance; they have not shown a "balance-of-payments deficit" or a "fundamental international payments problem."

## D.    Defendants' reliance on *V.O.S. Selections* is misplaced and contradicts their own prior position.

The government's reliance on this Court's discussion of Section 122 in *V.O.S. Selections, Inc. v. Trump*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), is misplaced. Defs.' Resp. 26. This Court did not endorse the view that Section 122 permits the President to impose tariffs in response to trade deficits generally. Instead, it held that if the President seeks to impose tariffs in response to a balance-of-payments concerns, he "must conform with the limits of Section 122." *Id.* at 1375. Because the appellate courts resolved *V.O.S. Selections* on the ground that IEEPA provides no tariff authority at all, *see Learning Resources, Inc. v. United States,* 146 S. Ct. 628 (2026); *V.O.S. Selections v. United States*, 850 Fed. App'x 789 (Fed. Cir. 2021), not this Court's finding that Section 122 narrowed the President's authority to issue tariffs in response to balance-of-payments deficits under IEEPA, *V.O.S. Selections*, 772 F. Supp. 3d at 1376, that holding regarding Section 122 was never affirmed and is not binding. *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) (statements not necessary to the decision are not binding).

Defendants' attempt to avoid this by accusing Plaintiffs of taking a contrary position in *V.O.S. Selections* is a distraction. Defs.' Resp. 36, 37 n. 3. Plaintiffs

Burlap & Barrel and Basic Fun! were not parties to that litigation, and arguments made by counsel on behalf of different clients in a separate case—addressing different claims—do not bind Plaintiffs here. Regardless, those prior statements merely argued that any such authority must *meet* Section 122's requirements; they did not concede that a simple trade deficit satisfies those requirements.

The government, however, has taken a truly contradictory position. In *V.O.S. Selections*, the government explicitly argued that Section 122 had no "obvious application" where problems "arise from trade deficits, which are conceptually distinct from balance-of-payments deficits." Reply Resp. for Appellants, *V.O.S. Selections, Inc. v. Trump*, Fed. Cir. No. 25-1812, at 13. It even cited legislative history to show that a large trade deficit could exist simultaneously with a payments *surplus*. *See* S. Rep. No. 93-1298, at 89 (1974). Now the government has reversed course, claiming that "balance-of-payments deficit" effectively means "trade deficit."

To justify its position in V.O.S. Selections as not contradictory here, the government claims its IEEPA tariffs responded to a "multifaceted emergency" including non-tariff barriers and defense industrial base concerns. Defs.' Resp. 37–38. That distinction is a fiction. Within hours of the Supreme Court striking down its IEEPA tariffs, the administration issued worldwide Section 122 tariffs at the same rate and with near-identical exceptions. It is not credible that the "multifaceted" concerns vanished in a single day—the same day that the Supreme Court happened to overturn the IEEPA tariffs, miraculously leaving behind only a

14

(supposed) "payments crisis" that fits Section 122. This was a simple attempt to re-label the same policy the Supreme Court just invalidated.

This Court should hold the administration to its previous admission that trade deficits are conceptually distinct from balance-of-payments deficits Section 122 was built to address.

## II.    The Court must independently determine whether the President's Proclamation satisfies Section 122's limits.

### A.    The President's compliance with Section 122 presents a reviewable legal question.

Defendants' own citation confirms that the President's Proclamation is reviewable. This Court reviews such executive determinations "to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements." *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984); Defs.' Resp. 17. Only "[t]he President's findings of fact and the motivations for his action are not subject to review." *Id.*

Plaintiffs' challenge argues that these tariffs fall outside the authority delegated by Congress under Section 122 and are inconsistent with the statute's requirements. Plaintiffs do not ask this Court to second-guess the President's factual determinations regarding, *inter alia*, the balance of trade. They ask this Court to determine the meaning of the statutory terms Congress enacted—specifically, whether "balance-of-payments deficit" can be redefined to mean "trade deficit." That is a legal question.

15

This is not a case about factual findings; it is a case about the meaning of words Congress wrote. And that sort of textual interpretation is squarely within this Court's purview—indeed, it is this Court's constitutional role. As the Supreme Court recently affirmed, "courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).

The fact that the statutory provisions at issue involve technical questions of economics does not alter the scope of this Court's review. "[E]ven when an ambiguity happens to implicate a technical matter, it does not follow that Congress has taken the power to authoritatively interpret the statute from the courts and given it to the agency. Congress expects courts to handle technical statutory questions. 'Many statutory cases' call upon 'courts to interpret the mass of technical detail that is the ordinary diet of the law.'" *Loper Bright*, 603 U.S. at 402 (quoting *Egelhoff v. Egelhoff*, 532 U. S. 141, 161 (2001) (Breyer, J., dissenting)) (cleaned up).

Nor is this a case "committed to agency discretion by law." Courts retain authority to review executive action unless a statute provides "no meaningful standard against which to judge" this executive action. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Section 122 provides such standards. It conditions tariff authority on specific statutory triggers—a "large and serious United States balance-of-payments deficit" and a "fundamental international payments problem." 19 U.S.C. § 2132(a)(1). Whether those statutory conditions are satisfied is a question courts are fully competent—and obligated—to decide.

16

## B.    Courts do not defer to the President's interpretation of statutory limits on delegated authority.

Plaintiffs are not asking this Court to second-guess the Proclamation's factual determinations about economic conditions, nor to assess the President's motives or policy judgments. They ask this Court to perform its core function: to determine whether the President's claimed authority adheres to the limits Congress imposed.

If courts cannot enforce those limits, then they do not exist. Every grant of statutory authority would become an open-ended delegation, and Congress would be unable to impose any binding intelligible principle on the Executive. Defendants' position would allow the President to define the scope of his own authority—an outcome the Constitution does not permit.

After *Loper Bright*, there is no basis for deferring to the Executive's interpretation of statutory terms. The Court must exercise its own independent judgment in determining whether Section 122's requirements are satisfied. 603 U.S. at 394.

Defendants suggest that the phrase "large and serious" renders the statute effectively unreviewable because it involves judgment. Defs.' Resp. 20–22. But courts routinely interpret and apply qualitative statutory standards. The presence of judgment does not eliminate judicial review; it requires it.

Even on Defendants' own framing, their interpretation would eliminate any meaningful constraint. Under their theory, the President could label any imbalance—no matter how small, or even nonexistent—as "large and serious," and

17

courts would be powerless to say otherwise. That is not a standard; it is the absence of one.

**C.      This Court has already rejected the argument that similar statutory standards are unreviewable.**

This Court has already rejected materially identical arguments in the IEEPA context. There, Defendants argued that the President's determination of an "unusual and extraordinary threat" was committed to his discretion and not subject to judicial review. This Court disagreed, holding that it could "manage" that standard using ordinary tools of statutory interpretation. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1378 (Ct. Int'l Trade 2025).

As this Court explained:

> In the trade context, for example, the antidumping statute permits the imposition of duties only where "the Commission determines that . . . an industry in the United States . . . is threatened with material injury." 19 U.S.C. § 1673. The court does not automatically uphold every material injury determination of the ITC on lack-of-manageable-standards grounds simply because "threatened with material injury" is an imprecise term that sounds in foreign affairs. Instead, the court consults "the traditional tools of statutory construction" to ascertain the term's meaning and applies that meaning to specific cases."

*Id.* (citing *Loper Bright*, 603 U.S. at 403).

The same principle applies here. That Section 122 uses terms like "large and serious" or "fundamental" does not render them unreviewable. It requires the Court to interpret those terms and apply them.

Nor does the foreign-affairs context change that conclusion. "Indeed, that '[t]rade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is traditionally accorded considerable deference . . . is not to

18

say . . . that courts will unthinkingly defer to the Government's view of Congressional enactments."' *Id.* (quoting *Fed. Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995).

This is especially true where, as here, the statute itself defines the limits of the President's authority. *See id.* Determining those limits is a judicial function. And enforcing them is essential to preserving the separation of powers.

## III. The major questions doctrine applies to economic regulations touching on foreign affairs.

### A. There is no "foreign affairs" exception to the major questions doctrine.

Defendants argue that the major questions doctrine does not apply to the President's conduct of foreign affairs. Defs.' Resp. 46–47. There is no such exception. The major questions doctrine is a rule of statutory interpretation that applies whenever an agency—or the President—claims to find in a "long-extant statute an unheralded power to regulate a significant portion of the American economy." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

An exception is particularly inappropriate here, where the Executive branch seeks to bypass Congress's core Constitutional authorities: the powers to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8 cl. 1, 3.

### B. *Learning Resources* reinforces that broad delegations are not blank checks.

Defendants cite the concurring and dissenting opinions in *Learning Resources* to argue that statutes touching foreign affairs must be broadly construed. They are

19

mistaken. Defendants fail to address the concurring opinion of Justice Gorsuch, which characterizes this new exception to the major questions doctrine as so broad as to be "hard to reconcile with the Constitution." *Learning Res. v. United States*, 607 U.S. \_\_\_, slip op. at 32 (2026) (Gorsuch, J., concurring).

As Justice Gorsuch noted, even the concurring justices who did not explicitly name the major questions doctrine actually joined the portion of the principal opinion that applied its reasoning. *Id.* at 2. Moreover, what Justice Kagan's concurrence calls "context" is functionally identical to the major questions doctrine's requirement: when the Executive claims an extraordinary power, it must identify clear statutory authority. *Id.* at 6. In short, *Learning Resources* does not exempt Section 122 from scrutiny; it mandates that the Court find "clear congressional authorization" for the President's sweeping economic intervention. *Learning Res.*, 607 U.S. \_\_\_, slip op. at 13 (quoting *Biden v. Nebraska*, 600 U.S. 477, 506 (2023)).

## C.    Section 122 is a "clear and limited" delegation, not a fundamental revision.

Defendants argue that because Section 122 was mentioned in *Learning Resources* as an example of a valid delegation, any invocation of it passes muster. Defs.' Resp. 47. But this ignores the distinction between the statute's existence and its misapplication. As Plaintiffs explained, Section 122 applies only in a specific circumstance—a balance of payments crisis—that does not exist here. Pls.' Memo 27.

Defendants' reliance on *Biden v. Nebraska* is therefore misplaced. Defs.' Resp. 47–48. There, the Supreme Court struck down an executive action because it

constituted a "fundamental revision of the statute." 600 U.S. at 502. By attempting to recast a decades-old trade deficit as a sudden payments crisis, Defendants are attempting the exact same kind of unauthorized statutory rewrite.

## IV.    If Defendants' interpretation were correct, Section 122 would violate the nondelegation doctrine.

### A.    Defendants' reading would eliminate any intelligible principle.

Defendants argue that "Section 122 expressly authorizes the imposition of duties subject to certain limitations," and that the Supreme Court has described Section 122 as an example of a "clear and limited delegation." Defs.' Resp. 49, quoting *Learning Res.,* 146 S. Ct. at 640. But the nondelegation question here is not whether Section 122 is constitutional as written—it is whether it remains constitutional under Defendants' interpretation of it. It does not.

Section 122 authorizes action only "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a)(1). That language reflects a narrow, time-limited delegation tied to a specific type of economic crisis. But Defendants reinterpret those statutory limits out of existence—treating a persistent trade deficit as sufficient and allowing the President to invoke the statute whenever he chooses.

If that reading were accepted, Section 122 would cease to impose any meaningful constraint. The statute would no longer supply an "intelligible principle" to guide the exercise of delegated authority, as required by the Constitution. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928).

21

## B.    Defendants' interpretation renders Section 122's limits meaningless.

Defendants insist that Section 122 contains "clear conditions" and "clear . . . timelines." Defs.' Resp. 51. But under their interpretation, neither constraint has any real force.

If a "balance-of-payments deficit" exists whenever the President says it does, then the statutory trigger imposes no limit at all. And if the United States' longstanding current-account deficit suffices, then the statute may be invoked indefinitely. Unlike the payments crisis that prompted Congress to enact Section 122—which was temporary—the trade deficit has been a recurring feature in the United States for nearly 50 years. And under Defendants' theory, the administration could simply re-invoke Section 122 every 150 days based on the persistent trade deficit, which is unlikely to disappear within 150 days.

That reading transforms a temporary emergency measure into a standing authorization for tariffs. But Congress did not enact Section 122 as a permanent trade policy tool; it enacted it to address discrete balance-of-payments crises.

## C.    The canon of constitutional avoidance confirms Plaintiffs' reading.

This Court should reject Defendants' interpretation for the independent reason that it raises serious constitutional concerns. When a statute is susceptible of two readings—one that preserves its constitutionality and one that does not—courts adopt the former.

Here, Plaintiffs' interpretation gives effect to Section 122's limits and preserves its constitutionality. Defendants' interpretation does the opposite: it converts a

22

"clear and limited delegation" into one that grants the President effectively unbounded discretion over tariffs.

That is precisely the type of delegation courts have cautioned against. *See Gundy v. United States*, 588 U.S. 128 (2019); *see also HMTX Indus. LLC v. United States*, 156 F.4th 1252, 1254 (Fed. Cir. 2023) (recognizing that delegations must contain meaningful constraints).

## V.    The Proclamation's product exceptions evidence a failure to exercise independent statutory judgment.

### A.    The exceptions show that the administration is attempting to shoehorn the unlawful IEEPA tariffs into Section 122.

Plaintiffs' opening brief addressed the product exceptions not because of harm resulting from specific exceptions, but because the exceptions confirm Defendants' unlawful implementation of Section 122. Instead of the targeted, findings-based, carveout required by the statute, the Proclamation's exception list is a mere retread of the IEEPA exceptions list—an attempt to shoehorn the President's preferred trade policy into a wholly different statutory vehicle.

Section 122 requires that tariffs "be of broad and uniform application," except where the President determines, "consistently with the purpose of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." 19 U.S.C. § 2132(e).

The Proclamation makes no such targeted determinations. It uses boilerplate language to except thousands of products that were previously exempt under the President's now-invalidated IEEPA tariffs. *See* Proclamation at ¶¶ 14–15. The Section 122 Proclamation's Annex II is functionally identical to the IEEPA

23

exception list; roughly 1,100 general product codes were simply carried over from the IEEPA orders. *See* Johannes Fritz, *The Section 122 Exemption Structure, Explained*, Glob. Trade Alert (Feb. 23, 2026)[2] (noting that the only substantive addition was eleven product codes for drones).

## B.    Defendants' post-hoc rationalizations cannot cure the initial failure to follow the statute.

Defendants now seek to provide post-hoc rationalizations for these exceptions through the Greer and Lutnick declarations, attempting to link them to the specific language of Section 122. *See* Greer Decl.; Lutnick Decl. Under well-settled principles of judicial review, an agency or executive officer must defend its action based on the reasons given at the time of the action—not those invented during litigation. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

The Proclamation does not explain how these 1,100 codes relate to a "balance-of-payments" crisis; it simply adopts the legacy of a "national emergency" regime. By copying the IEEPA list, the President failed to perform the specific economic assessment Congress mandated in Section 122(e).

## C.    The unlawful exceptions are not severable from the Proclamation.

Defendants argue that even if the exceptions are invalid, they are severable due to the Proclamation severability clause. That is incorrect. The exceptions and the

---

[2] https://globaltradealert.org/blog/s122-exemption-structure-explained?utm_source=chatgpt.com

24

tariffs "embod[ies] a single, coherent policy" that must "stand or fall as a whole" with the Section 122 tariff regime. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999).

Here, the exceptions are not ancillary—they reflect the President's determination that tariffs on these goods would harm "the needs of the United States economy." 19 U.S.C. § 2132(e). The tariffs and the exceptions operate as a single policy judgment about which imports may be burdened without causing unacceptable economic harm.

Striking the exceptions while leaving the tariffs in place would produce a regime the President himself rejected—one that imposes duties on goods he determined should remain exempt. Courts are not permitted to rewrite a Proclamation to create a materially different policy than the one the Executive adopted.

If the exceptions lack a lawful basis, the Proclamation "must stand or fall as a whole." *Mille Lacs*, 526 U.S. at 191.

## VI.    The injunctive relief factors favor Plaintiffs.

Defendants argue that the tariffs do not immediately, irreparably harm Plaintiffs (Defs.' Resp. 68–71); that there is a valid public interest in enforcing unconstitutional tariffs (*id.* at 71–72); and that the balance of hardships favors Defendants (*id.* at 72). These arguments all fail.

### A.    Plaintiffs will suffer irreparable harm.

Defendants argue that the tariffs do not immediately or irreparably harm Plaintiffs. Defs.' Resp. 68–71. They claim that even though "both private plaintiffs appear to have imported goods subject to Section 122 duties," Defs.' Resp. 69 n.23,

25

Plaintiffs offer only "speculative and generalized concerns" about the impacts of the tariffs, which do not constitute "hard evidence" that Plaintiffs face "immediate extinction absent a preliminary injunction." *Id.* at 70–71. But a plaintiff need not face total business failure to establish irreparable harm.

Plaintiffs have established that they will import goods subject to these duties in the regular course of business. Plaintiff Burlap & Barrel cannot avoid these tariffs by switching to domestic alternatives; the spices it imports simply cannot be grown in the United States. Pls.' Mem. 36, citing Frisch Decl. ¶¶ 6–11. These illegal tariffs force spending pauses on innovation, halt new product development, and require price increases that violate long-standing customer commitments—damages that cannot be undone by a later refund. *Id.* at 36–37, citing Frisch Decl. ¶ 13.

Likewise, Basic Fun! cannot raise prices without losing its market position. The illegal tariffs eliminate its profit margins, forcing hiring freezes and the cancellation of growth opportunities. *Id.* at 37, citing Foreman Decl. ¶¶ 16–17, 20–21.

A monetary refund is inadequate because these losses—lost business opportunities, reputational damage, and loss of goodwill—are precisely the kind that cannot be addressed by money alone. *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). As this Court has held, "bankruptcy or a substantial loss of business may constitute irreparable harm because those events render a final judgment ineffective and deprive movant of 'meaningful judicial review.'" *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade 2024) (citations omitted).

**B.    The balance of hardships and public interest favor an injunction.**

The balance of hardships and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants claim a public interest in maintaining the tariffs. Defs.' Resp. 71. But "the government has no legitimate interest in upholding an unconstitutional system." *United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971) (Brennan J., concurring).

The public interest is instead served by ensuring that the Executive complies with the law. *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). And the economic impact from these tariffs is widespread and well-documented. *See, e.g.,* Paul Davidson, et al., *Is America's Economic Slip Temporary? Trump, Biden Allies Divided Over GDP Report,* USA Today (April 30, 2025) (noting economic damage);[3] Mary Cunningham, *IMF Forecasts Slower U.S. Economic Growth in 2025, Pointing to Escalating Trade War,* CBS News (April 22, 2025) (tariffs are slowing economic growth);[4] Olesya Dmitracova, *The Economic Damage From Trump's Tariffs is Piling Up*, CNN, Apr. 23, 2025 (noting growing damage);[5] Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Foundation, Apr. 11, 2025 (estimating extensive economic damage likely to be caused by the tariffs).[6] This Court may take judicial notice of these

---

[3] https://www.usatoday.com/story/money/2025/04/30/gdp-report-economy-tariffs-impact-q1-2025/83333454007/

[4] https://www.cbsnews.com/news/imf-us-economy-2025-trade-war-tariffs-economic-outlook/

[5] available at https://www.cnn.com/2025/04/23/economy/uk-germany-economy-tariffs-intl/index.html

[6] https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/.

prevailing economic conditions. *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 399 (1937).

Finally, the public interest is not served by the erosion of separation of powers. Defendants assert unreviewable authority to impose tariffs under Section 122 by declaring a "balance-of-payments deficit" whenever any component of the balance of payments has a deficit, effectively transforming a narrow trade statute into a grant of limitless domestic power. But even in the context of foreign policy, executive action is subject to judicial review. *Hamdi v. Rumsfeld,* 542 U.S. 507, 531, 533 (2004) (holding that sensitive governmental interests may not erode essential constitutional promises).

Granting an injunction serves the public interest by preserving the status quo and ensuring that this Court can provide meaningful judicial review before Plaintiffs' businesses are permanently damaged by an unlawful regime. *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021). *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1332 (Ct. Int'l Trade 2014) ("The public interest is served by the accurate and effective, uniform and fair enforcement of trade laws.").

## Conclusion

For the reasons set forth herein, and those stated in Plaintiffs' opening memorandum, this Court should grant Plaintiffs' motion for preliminary injunction and summary judgment, declare the February 20, 2026 Proclamation unlawful, and permanently enjoin its enforcement.

Dated: April 7, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org

# Certificate of Compliance

I, Jeffrey Schwab, hereby certify that this brief complies with the 7,000-word limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) and this Court's March 12, 2026 Order (see Dkt. 8), because this brief contains 6,921 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted

Dated: April 7, 2026

/s/ Jeffrey M. Schwab
Jeffrey M. Schwab
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org

*Counsel for Plaintiffs Burlap and Barrel, Inc, and Basic Fun, Inc.*

30

## Certificate of Service

I, Jeffrey Schwab, one of the attorneys for Plaintiffs, certify that the foregoing document was filed electronically with the Court's Case Management/ Electronic Case Filing (CM/ECF) system on March 13, 2026. The Court and/or Clerk of Court may serve and give notice to counsel by CM/ECF electronic transmission.

Respectfully submitted

Dated: April 7, 2026

/s/ Jeffrey M. Schwab
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org

*Counsel for Plaintiffs Burlap and Barrel, Inc, and Basic Fun, Inc.*