## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| THE STATE OF OREGON, et al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, et al.,<br><br>    Defendants. | CASE NO. 26-01472 |

### DECLARATION OF HOWARD W. LUTNICK, UNITED STATES SECRETARY OF COMMERCE

I, Howard W. Lutnick, hereby state and declare as follows:

1. I am the Secretary of Commerce for the United States and the head of the Department of Commerce, an Executive Department of the United States. *See* 5 U.S.C. § 101. The purpose of this declaration is to assert, in my official capacity and opinion, how the failure to issue a stay in this case will cause irreparable harm to the United States by negating the critical role of the tariffs President Donald J. Trump has imposed under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132 ("Section 122") in redressing significant balance-of-payments issues that the United States faces. The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2. Many of the fundamental problems the United States faces, ranging from the hollowing out of our defense-industrial and manufacturing base to balance-of-payment deficits and risk of significant currency depreciation, are caused by systemic trade imbalances with our foreign-trading partners.

3. The Department of Commerce has played a pivotal role in implementing the President's visionary trade policies. These policies have led to us securing historic trade deals and investment commitments from our trading partners, which are already yielding unprecedented returns that will contribute to redressing longstanding trade deficits and other economic issues.

4. Proclamation 11012 imposed a temporary 10 percent ad valorem surcharge on certain imports, subject to specified exceptions, effective February 24, 2026. The President imposed that surcharge after determining that fundamental international payments problems exist, that those problems significantly harm United States national interests, including economic and national-security interests, and that special measures to restrict imports are required to address those problems.

5. The Proclamation rests on the condition of the United States' international payments position and the President's judgment that those conditions impair United States national interests, including economic and national-security interests. The President found that the United States faces fundamental international payments problems; that special import measures such as surcharges and quotas are key tools to protect the economy and national security of the United States; and that large and serious balance-of-payments deficits can endanger the ability of the United States to finance its spending, erode investor confidence in the economy, and distress financial markets.

6. The President found in Proclamation 11012 that the United States runs a substantial trade deficit, that the annual balance on primary income turned negative in 2024 for

the first time since at least 1960, that the United States maintained a current-account deficit of 4.0 percent of GDP in 2024, that the United States' net international-investment position has deteriorated substantially, and that the balance on secondary income has been persistently in deficit since the 1960s.

7. The Section 122 surcharge is a temporary import restriction designed to help deal with those fundamental international payments problems. It is also part of a broader transition in United States trade policy following the Supreme Court's decision invalidating the prior IEEPA tariff program. The surcharge acts as a global baseline tariff that prevents the resurgence of conditions such as extremely high imports and trade deficits that contributed to the balance of payments problems found in Proclamation 11012. In my view, premature removal of the surcharge would usher in a flood of imports that characterized the pre-global tariff landscape, exacerbating the imbalances that Proclamation 11012 is designed to prevent.

8. The timing and full duration of the targeted Section 122 surcharge matters. Section 122 is, by design, temporary. The surcharge is scheduled to last only 150 days. If the surcharge is suspended or invalidated during the pendency of appeal, the harm cannot be repaired later. The United States cannot recover the lost import-restricting effect of a temporary measure after the statutory period has run. Nor can the United States reconstruct the negotiating leverage, market expectations, or trade flows that would be lost during that period.

9. Recent import data demonstrates why the temporary surcharge is necessary. In January, February, and March 2025—the three months immediately before President

3

Trump announced the global tariff program under the International Emergency Economic Powers Act—goods imports into the United States reached extraordinary levels. According to the Census Bureau's seasonally adjusted data for United States trade in goods with the world, imports totaled approximately $327 billion in January 2025, $325 billion in February 2025, and $344 billion in March 2025. Those were the three largest goods-import totals ever recorded.[1]

10. Those three months alone totaled just under $1 trillion in goods imports, for an average of $332 billion per month. That was an extraordinary import surge and reflected the scale and immediacy of the imbalance the Administration confronted.

11. After President Trump announced and implemented the global tariff program under IEEPA, imports immediately declined. Seasonally adjusted goods imports from the world fell from $344 billion in March 2025 to $275 billion in April 2025, a one-month decline of approximately 20% and totaling approximately $69 billion. Goods imports remained materially lower in the following months, including $275 billion in May 2025, $262 billion in June 2025, and $280 billion in July 2025.

12. When the President's broader global tariff regime was put in place for all countries in August 2025, the same pattern remained evident. Seasonally adjusted goods imports from the world fell from $280 billion in July 2025 to $262 billion in August 2025, a reduction of approximately $18 billion in one month. Compared with the January–March 2025 monthly average of $332 billion, August 2025 imports were approximately $70 billion lower.

---

[1] *See* U.S. Census Bureau, Trade in Goods with World, Seasonally Adjusted, available at https://www.census.gov/foreign-trade/balance/c0004.html.

13. These trends have contributed to an unprecedented, immediate, and sustained reduction in trade deficit levels, which directly address a key component of the balance of payment deficit identified in Proclamation 11012. In just one month following enactment of the IEEPA tariffs, the monthly trade deficit was almost cut in half from $161.5 million in March 2025 to $85.4 billion in April 2025. That deficit has consistently remained at reduced levels, including through the transition to the Section 122 proclamation. The most recent Census data available is for March 2026—the first full month following removal of the IEEPA tariff regime and transition to Section 122—reflects an increase in imports to almost $300 billion, but is still commensurate with the reduced and decreasing deficit levels that characterize the global tariff regime due in part to an increase to an all-time-high in exports.

14. These figures are important because they show that broad tariff measures affect import behavior. Importers respond to tariff expectations. Foreign producers respond to tariff expectations. Trading partners respond to tariff expectations. When the United States maintains a credible tariff baseline, it affects the timing, volume, and pricing of imports into the United States.

15. The inverse is also true. When a broad tariff baseline is removed or expected to be removed, import volumes can rise quickly. After the Supreme Court invalidated the IEEPA tariff program in February 2026, imports increased in the latest month for which Census seasonally adjusted world-goods data are available. Goods imports from the world surged to $299.95 billion in March 2026, the fourth highest single month in history.

16. That increase occurred even with the 10 percent Section 122 surcharge in effect for March 2026. In my judgment, that is significant. It indicates that the Section 122 surcharge is not excessive or unnecessary. It indicates the opposite: even with the surcharge, import pressures remain substantial. Removing the surcharge would remove the only global baseline currently restraining an unprecedented spike in import flows while the Administration continues to address the United States' balance of payments issues.

17. The Section 122 surcharge is therefore serving a critical stabilizing function. It is helping prevent a return to the extraordinary import levels that prevailed ahead of the President's imposition of global tariffs. It is helping restrain imports while the United States addresses fundamental payments problems. And it is helping preserve the effectiveness of the President's trade strategy during a short but important transition period.

18. If this Court's decision takes effect and the Section 122 surcharge is removed, I expect importers and foreign producers to respond immediately. They will have a strong incentive to accelerate shipments into the United States before other tariff measures are finalized or implemented. Based on the import patterns described above, I expect that goods imports in May 2026 and subsequent months would increase above the levels that would otherwise prevail with the surcharge in place.

19. That increase would directly undermine the objectives of Proclamation 11012. The Proclamation was designed to restrict imports temporarily in order to deal with large and serious United States balance-of-payments deficits and related fundamental

6

international payments problems. Removing the surcharge would do the opposite. It would invite additional imports during the very period in which the United States is attempting to stabilize its trade position and transition to more targeted measures.

20. If the surcharge is removed now, foreign producers and trading partners will have every incentive to increase shipments, preserve dependence on foreign supply, and entrench their position in the United States market before other actions such as tariff measures and investment commitments and plans can be finalized. The result would be a surge of imports during the precise period in which the United States is attempting to strengthen its position in the international payments system, protect its industrial base, and move from temporary balance-of-payments action to a robust domestic manufacturing environment supported by other targeted trade remedies. The surcharge reinforces the seriousness of the United States' position and demonstrates that the United States will not allow large and persistent payments imbalances to continue unchecked while negotiations and statutory investigations proceed.

21. Conversely, suspending or invalidating the surcharge now would send the opposite signal. It would tell trading partners that the United States cannot maintain even a temporary, globally applicable import measure during a period of serious payments stress. It would encourage delay. It would reduce incentives for foreign governments to address policies that undermine United States commerce and national security.

22. Failing to issue a stay also creates substantial uncertainty for importers, foreign producers, and trading partners. That uncertainty itself changes behavior. Importers

may accelerate shipments in anticipation of refunds, broader relief, or further litigation. Foreign producers may increase shipments to take advantage of perceived weakness in the United States' tariff posture.

23. These market effects are difficult to quantify precisely in advance, but they are real. Trade flows respond to tariff expectations. The early 2025 import surge, the decline following the IEEPA tariff announcements, the decline following full implementation in August 2025, and the March 2026 increase following the Supreme Court's February 2026 decision all demonstrate that import behavior changes rapidly when the tariff environment changes.

24. The United States cannot remedy these harms after the fact. Once goods enter the United States in higher volumes, the import-restricting effect of the temporary surcharge for that period is lost.

25. The Proclamation's exceptions further confirm that the measure is calibrated to national-security needs. The surcharge does not apply on top of tariffs imposed under Section 232, which are themselves designed to address national-security risks in specific sectors. That structure avoids disrupting carefully designed national-security tariff programs for steel, aluminum, autos, critical minerals, and other strategic sectors. It preserves the President's ability to use Section 232 and other authorities in a targeted manner while Section 122 addresses the broader balance-of-payments problem.

26. In other words, the Section 122 surcharge does not displace the Administration's national-security trade architecture. It supports it. It provides a temporary baseline

8

while sector-specific tools, including Section 232, operate or are developed. Removing that baseline would weaken the entire structure by creating a gap during which imports could surge, trading partners could delay, and foreign producers could deepen their position in the United States market.

27.  The surcharge is also carefully limited. It is temporary. It is set at 10 percent, below the maximum 15 percent surcharge authorized by Section 122. Maintaining the surcharge during appeal would preserve the status quo established by the President's Proclamation. Suspending it would not preserve the status quo. It would change the tariff environment, invite import acceleration and flooding the market, thereby exacerbating the very balance of payments issues that Proclamation 11012 sought to address.

28.  A stay is especially important because the Section 122 surcharge is temporary by law. The remaining period is short. If the Government ultimately prevails on appeal after the surcharge has been suspended for much or all of the remaining 150-day period, the practical benefit of the surcharge will have been lost.

29.  In my judgment, allowing the Court's decision to take effect during appeal would cause serious and irreparable harm to the United States. It would impair the President's ability to address the fundamental international payments problems identified in Proclamation 11012. It would increase the likelihood of higher imports in the coming months, unwinding the serious progress the Administration has made in reducing the trade deficit that feeds directly into current balance of payment problems. It would simultaneously weaken the United States' national security and

economic security posture while also undermining our position with trading partners during ongoing negotiations.

30.  For these reasons, I respectfully submit that a stay pending appeal is necessary to prevent irreparable harm to the United States and to preserve the effectiveness of the President's temporary Section 122 action while appellate review proceeds.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of May, 2026, in the City of Washington, District of Columbia.

_____
Howard W. Lutnick
41st United States Secretary of Commerce

10